Gregory A. LUCAS, Appellant,

v.

Benny O. HODGES, Administrator,
Lorton Reformatory, et al.

No. 83–1099.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 13, 1983.

Decided March 23, 1984.

Daniel R. Ohlbaum, Washington, D.C. (appointed by this Court), for appellant.

Michele Giuliani, Asst. Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel (at time brief was filed), and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellees.

Before WALD and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge STARR.

WALD, Circuit Judge:

This is an appeal from the dismissal of a *pro se* prisoner's civil rights complaint against federal prison officials in Marion, Illinois, and local officials in the District of Columbia. Gregory Lucas alleged in his complaint that the D.C. officials deprived him of various constitutional rights when they classified him as a prisoner requiring "Special Handling" on the basis of an allegedly false report that he attempted to escape while confined at the Marion federal prison. He asked for injunctive relief and damages. The district court dismissed the complaint against the Marion officials without prejudice to refiling in the Southern District of Illinois. The court dismissed the claims against the D.C. officials on the ground that those officials were entitled to rely on the report of officials at the Marion federal prison or, in any event, on a 1978 escape attempt at Lorton which, according to the court, the plaintiff does not contest. Lucas appealed from the dismissal of his complaint.[1]

We believe that the district court acted too hastily in dismissing this complaint. With respect to his procedural due process claim against the D.C. officials, we cannot say "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (per curiam). We therefore reverse the decision of the district court insofar as it dismissed the procedural due process claim against D.C. offi-

cials, and remand for further consideration of this issue.

## I. BACKGROUND

Gregory A. Lucas was sentenced in the Superior Court for the District of Columbia on August 1, 1978, to a term of five to fifteen years. He was transferred from the D.C. Detention Facility to Lorton—first to the Maximum Security Facility and then to a general population cellblock. On November 19, 1978, Lucas was apprehended in an apparent escape attempt and placed in the Adjustment Unit at Lorton.

As a result of the apparent escape attempt, Lucas was transferred on October 5, 1979, first to the federal prison in Terre Haute, Indiana, and later to the prison in Marion, Illinois. He brought suit in the Southern District of Illinois successfully challenging the legality of this transfer, which was effected without giving Lucas a notice of reasons as required by Order 4810.1 of the D.C. Department of Corrections.[2] He was transferred back on February 24, 1982, to the D.C. Corrections System, where he was placed on Special Handling status. Special Handling is an administrative classification imposing certain restrictions on prisoners who present special security problems.[3] According to government counsel at oral argument, Lucas was confined on his return at the D.C. Detention Facility for about four weeks and then transferred to Lorton, where he was confined in the Maximum Security Facility until his parole on December 22, 1983.[4] He was in Special Handling status at both facilities.

On March 6, 1982, while at the D.C. Detention Facility, Lucas filed a Request for Administrative Remedy, stating as follows:

I have been unlawfully placed on Special Handling without any sufficient reasons,

---

1. Counsel was appointed to represent Lucas on appeal. We commend counsel for the valuable service he has rendered his client and this court.

2. *Lucas v. Miller,* Civil No. 81–4412 (S.D.Ill. Jan. 4, 1982).

3. *See infra* notes 14 & 15 (internal regulations governing Special Handling).

4. *See infra* note 9.

and I am being denied the same privileges as that of other inmates. The Adjustment Board placed me on Special Handling in related [sic] to my past record in which I have been punish [sic], and in which I am being subject to the same punishment again upon my transfer to the D.C. Jail, from Marion. I was not informed as no Special Handling Case. I am being subject to the same treatment and/or punishment as that of a prisoner on Disciplinary Segregation. I am being punished and restricted to the same privileges as that of other inmates, without any Disciplinary Report. [I would like to request for the same privileges as that of other inmates, and to be taken off Special Handling].

In response, he received the following explanation from E.P. Slothouber, Director of the D.C. Detention Facility: "You were placed on Special Handling based on information from Marion, Ill. You will remain in your present situation and be reviewed periodically." The following notation appears on the transfer order pursuant to which Lucas was transferred from Marion: "Lucas involved in recent escape attempt from USP–Marion; information received his life may be in danger—take all necessary precautions in transit." We cannot determine from the record whether or not Lucas was given a copy of this document.

Lucas filed a complaint in federal district court[5] on April 23, 1982, after his transfer to Lorton, against the Administrators of Lorton and of the D.C. Detention Facility, the Director and Assistant Director of the

D.C. Department of Corrections and the Warden of the United States Penitentiary at Marion. He alleged that the report of his escape attempt from Marion was false, and, repeating the claims made in his administrative complaint, that he was subject to severe restrictions equivalent to those associated with disciplinary segregation without an opportunity to defend himself against the escape charges.[6] Lucas requested declaratory and injunctive relief and damages for the violation of his constitutional rights under the eighth amendment, the due process clause, and the equal protection clause, naming 42 U.S.C. §§ 1981, 1985, and 1986 as the bases for his claims.[7]

■ Defendant Hodges, Administrator at Lorton, moved to dismiss on the grounds that the allegations stated no claim under the designated statutory sections and that the court lacked personal jurisdiction over him.[8] The district court dismissed the complaint against all D.C. officials, stating first that the D.C. officials were entitled to rely on the report of the Marion officials that Lucas was involved in an escape attempt, and that any complaint based on the alleged falsity of the escape charge rests only against the Marion officials. The court stated further that even if there had been no escape attempt at Marion, the D.C. officials were authorized to place Lucas in Special Handling status solely on the basis of the 1978 Lorton escape attempt that, according to the court, Lucas did not contest. The court also dismissed claims against the Marion officials without preju-

5. He filed initially in the Eastern District of Virginia. But the court immediately transferred the matter to this court, *see Lucas v. Hodges,* Civil No. 82–0377AM (E.D.Va. Apr. 23, 1982), in accordance with the general practice announced in *Wright v. Jackson,* 505 F.2d 1229 (4th Cir. 1974) (complaints by inmates at Lorton should be heard in D.C. courts).

6. *See, e.g.,* Amended Complaint at ¶ 23 ("defendants ... have placed plaintiff on Special Handling status, and subject[ed] the plaintiff to disciplinary punishment without a hearing"); *id.* at ¶ 20 ("defendants ... [have] subjected the plaintiff to the same treatment, as that of a disciplinary prisoner"). Counsel for plaintiff on appeal

stated that he was informed by his client that Special Handling had restricted opportunities for recreation, religious activity and work release. *See also infra* note 12.

7. In his Amended Complaint Lucas omitted any reference to particular civil rights statutes.

8. This jurisdictional claim was not dealt with by the district court, nor was it argued on appeal. Because jurisdiction is a threshold requirement, and was timely raised, the district court must determine on remand, before proceeding further on the merits, whether it may exercise jurisdiction over defendant Hodges in his personal capacity.

dice to a subsequent filing in the Southern District of Illinois, reasoning that "[T]his claim centers on conduct that occurred in a federal prison in Illinois and ... any alleged procedural flaws in preparing the report of plaintiff's escape attempt would have to be remedied by the Marion correctional facility." This appeal followed.

We have been informed by the government that Lucas was released from Lorton on parole on December 22, 1983, less than two weeks after oral argument.[9] He is to remain in the Washington metropolitan area and comply with various other conditions of parole. We must thus decide, among other issues, the effect of his release on this action.

## II. THRESHOLD ISSUES

■ We conclude first that the district court acted properly in dismissing without prejudice Lucas' complaint against the Marion officials. Apart from any problems of personal jurisdiction, the claim for damages against the prison warden in his personal capacity cannot properly be heard in this district under the applicable venue provision, 28 U.S.C. § 1391(e). *See Stafford v. Briggs*, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980). Although Lucas' complaint clearly requests injunctive relief as well, we cannot determine what form of injunctive relief he requests or even whether that request extends to officials at Marion, from which Lucas was transferred two months before he filed his complaint. In the event that he decides to pursue his claims against the Marion officials in the Southern District of Illinois, he should have the opportunity to clarify the form of relief requested.

■ The district court also dismissed the claims against officials at the D.C. Detention Facility and at Lorton for failure to state a cause of action. Lucas' release on parole, however, requires us to determine the extent to which those claims are now moot. We conclude that his claims for injunctive relief became moot upon his release on parole.[10]

Only the claims for damages against officials at the D.C. Detention Facility and Lorton, which the district court dismissed on the merits, remain. As to those we are plagued in this case by both a less than entirely lucid complaint and a murky factual record. The Supreme Court, however, has left no doubt as to the standard by which a *pro se* prisoner's complaint should be viewed on a motion to dismiss. In *Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (per curiam), the Court was faced with the dismissal of a *pro se* prisoner's complaint that he had been placed and kept in a segregation cell without due process of law. Taking note that *pro se* complaints are held "to less stringent standards than formal pleadings by lawyers," *id.* at 9, 101 S.Ct. at 176 (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972)), the Court declared that "[s]uch a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 10, 101 S.Ct. at 176. Furthermore, the Court noted, "the allegations of the complaint are

---

9. Letter from Michele M. Guiliani, Assistant Corp. Counsel, D.C., to George A. Fisher, Clerk of the U.S. Ct. of Appeals, D.C. Circuit (Jan. 9, 1984). We admit to being somewhat perplexed that the government failed to inform us at or before oral argument on December 13, 1983, that Lucas had been granted parole on November 7, 1983.

10. *See, e.g., Illsley v. United States Parole & Probation Dep't*, 636 F.2d 1 (1st Cir.1980), *cert. denied*, 450 U.S. 1032, 101 S.Ct. 1744, 68 L.Ed.2d 228 (1981); *Winsett v. McGinnes*, 617 F.2d 996, 1003–04 (3d Cir.1980) (en banc), *cert. denied sub nom. Anderson v. Winsett*, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981); *Lokey v. Richardson*, 600 F.2d 1265 (9th Cir.1979) (per curiam), *cert. denied*, 449 U.S. 884, 101 S.Ct. 238, 66 L.Ed.2d 110 (1980). Our conclusion might be different if plaintiff's complaint requested expungement of information from his files. *Cf. Paine v. Baker*, 595 F.2d 197 (4th Cir.1979) (prisoner who requests and is denied expungement of information from files may, under some circumstances, state due process claim for such relief). We do not, however, think it can reasonably be so read.

generally taken as true for purposes of a motion to dismiss." *Id.*

Applying these principles to the plaintiff's amended complaint, we note first that it should be treated as a claim under 42 U.S.C. § 1983.[11] It is not clear from the decision whether or not the district court did so. Nevertheless, we conclude that the district court properly dismissed plaintiff's claims insofar as they alleged cruel and unusual punishment and a violation of the equal protection clause. No reasonable construction of the plaintiff's complaint could meet the requirements for making out a violation of those constitutional provisions.

■ However, Lucas' claims under the due process clause are not so easily disposed of. He alleges that at both the D.C. Detention Facility and Lorton he was classified as a Special Handling case and thus subjected to restrictions equivalent to those imposed on prisoners in segregation without due process and on the basis of false information. Lucas' complaint plainly alleges a deprivation of liberty without due process. Lucas has alleged—and indeed it appears to be undisputed—that he was given no opportunity to contest his placement in Special Handling either before or after the initial decision. Furthermore, he has alleged, and we therefore assume, that Special Handling status entailed significant restrictions comparable to those attending disciplinary segregation on the liberty he would otherwise retain as a member of the general prison population.[12]

■ We cannot tell whether the district court construed the complaint as alleging a deprivation of liberty without due process of law. The district court held only that the D.C. officials were entitled to rely on the report of the Marion officials of Lucas' escape attempt, or, in any event, on his prior escape attempt from Lorton. We find the district court's treatment of this claim inadequate. If Lucas had a liberty interest at stake he was entitled to at least minimal due process safeguards—notice of the reasons for the decision and some opportunity to respond. This is true even though the Department of Corrections officials may have had documentation of the earlier Lorton escape attempt; the prison officials cannot rely now on this earlier incident to justify at least their initial decision since they informed Lucas that he was placed in Special Handling "based on information from Marion, Ill."

The government now views Lucas' complaint as a section 1983 claim alleging a deprivation of liberty without due process. It urges as its sole argument on appeal that "[n]othing in the United States Constitution or in [l]ocal [l]aws and [r]egulations requires the Department of Corrections to provide prisoners with notice and a hearing prior to classifying them as requiring 'Special Handling.'" Brief for Appellee at 7. We turn to a closer examination of Lucas' due process claim.

### III. THE DUE PROCESS CLAIM

■ The severity of the restrictions imposed on a prisoner is not ordinarily the touchstone of a procedural due process

---

**11.** It is not necessary that § 1983 be cited in the complaint. *See Bowers v. Campbell,* 505 F.2d 1155, 1157 (9th Cir.1974); *Thorn v. New York City Dep't of Social Services,* 523 F.Supp. 1193, 1201 (S.D.N.Y.1981).

**12.** An official prison directive on Special Handling at the D.C. Detention Facility, *see infra* note 14, strongly corroborates the plaintiff's claim: Special Handling Residents are to be assigned single cells in the Adjustment Unit and must be kept in full restraints whenever they are removed from the cell. The plaintiff's claims about the significance of Special Handling at Lorton are not similarly corroborated by official policy directives. *See infra* note 15.

The government informed us at oral argument that Special Handling status at Lorton carries with it very few restrictions beyond those to which all prisoners in the Maximum Security Facility are subject. It may be the case, however, that placement in the Maximum Security Facility is itself a direct consequence of the Special Handling designation at Lorton, as we note appears to be the case at the Detention Facility. *See infra* note 14. In any event, we certainly cannot state "beyond doubt that the plaintiff can prove no set of facts" that would meet this threshold requirement. *Hughes v. Rowe,* 449 U.S. at 10, 101 S.Ct. at 176.

claim. In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Court reiterated the principle that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Id.* at 869 (*citing Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976)). In *Hewitt* itself, the Court held that administrative segregation, which involved restrictions we assume to be similar to those complained of here, *see id.* at 869 n. 4, did not infringe on a liberty interest independently protected by the due process clause. 103 S.Ct. at 870.

■ Nonetheless, as *Hewitt* reaffirmed, the state may create a liberty interest through statutory or regulatory measures limiting official discretion to deny important privileges or impose significant restrictions. These measures can thus trigger the procedural requirements of the due process clause. The Court found in *Hewitt* that Pennsylvania had created such a liberty interest by providing that administrative segregation was to be imposed only upon certain substantive predicates—"the need for control" or "the threat of a serious disturbance"—and by prescribing, in explicit and mandatory language, a procedural regime by which the decision was to be made. *Id.* at 871 & n. 6.

In *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), only two months later, the Court further clarified the meaning of *Hewitt*. In *Olim*, a prisoner had challenged his transfer from a state prison in Hawaii to one in California. The State of Hawaii had provided by regulation a set of procedures by which a pris-

oner could challenge a transfer decision, but it had established no substantive standards whatsoever to limit the discretion of the ultimate decisionmaker. Indeed, the Supreme Court of Hawaii had previously held, in *Lono v. Ariyoshi*, 63 Haw. 138, 144–45, 621 P.2d 976, 980–81 (1981), that "the prison administrator's discretion to transfer an inmate is completely unfettered." *Id.* at 1747. Because the prison officials had retained the discretion to transfer a prisoner "for any constitutionally permissible reason or for no reason at all," the Court held that the state had not created a protected liberty interest. *Id.* (*quoting Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring)).

Under D.C.Code § 24–442, the Department of Corrections has broad discretion to classify inmates. No published Department of Corrections regulation limits the discretion to assign a D.C. prisoner to Special Handling status.[13] Appellee therefore urges us to hold that, under *Hewitt* and *Olim*, as a matter of law, the District of Columbia has not limited the discretion of prison officials to place a prisoner in Special Handling status, and therefore Lucas cannot claim a liberty interest in not being so placed that is protected by the due process clause.

The appellant claims, however, that the discretion of prison officials at both the D.C. Detention Facility and the Lorton Reformatory is limited by official statements of prison policy contained in internal directives, and that these documents give rise to a liberty interest. Service Order 5000.1, promulgated by the D.C. Department of Corrections Detention Facility and signed by its superintendent on April 18, 1977,[14] has the stated purpose of "estab-

---

**13.** Lorton is now governed by a set of precise regulations concerning "adjustment" and "housing" actions, such as placement in administrative segregation. *See* 28 D.C.Reg. 865 (Feb. 27, 1981) (text of regulations). It is not clear whether these regulations, which do not explicitly mention Special Handling, and which took effect on September 18, 1982, *see* 29 D.C.Reg. 4387 (Oct. 8, 1982), after the decision to place

Lucas in Special Handling, would have governed that decision if they had been in effect at the time.

**14.** *SERVICE ORDER 5000.1*

SUBJECT: Special Handling Residents

1. *Purpose.* The purpose of this order is to establish definitive policy and procedures gov-

lish[ing] definitive policy and procedures governing inmates who have been designated as 'Special Handling Residents.'" Division Operations Procedure 4090.1, governing the Maximum Security Division of Correctional Services at Lorton and issued by the prison administrator on April 20, 1977,[15] states as its purpose: "to establish

erning inmates who have been designated as "Special Handling Residents".

. . . .

3. *Explanation.* Special Handling designation is a procedure for removal of an inmate from the general population for Security or Administrative reasons. Special Handling designation is in no way to be interpreted as punitive action nor is it necessarily to be considered an adverse action.

4. *Procedure.* The following categories of residents should be among those residents considered for Special Handling:

a. Identified with large scale organized criminal activity.

b. Residents who have created unusual public concern, who are likely to cause adverse public reaction toward themselves or the Department.

c. Record of prior escape.

d. Record of unprovoked assault on other residents or staff.

Recommendation for the designation of Special Handling may be made by the Superintendent, Administrator of Correctional Supervisors. Recommendation will be forwarded to the Adjustment Committee for action within twenty-four (24) hours. The Special Handling notice attached herewith, enclosure (1), will be prepared and a statement added to the Notice briefly outlining the reasons for designation. The Special Notice will bear the date and signature of Adjustment Board Members.

Security precautions—the following minimal security precautions will be observed:

a. Resident will be assigned single cell housing in the Adjustment Unit, Detention Facility.

. . . .

c. Resident will not be removed from their cells unless in full restraints.

d. Resident will wear full restraints and be escorted by a minimum of two (2) Correctional Officers for visits (social-legal), medical trips and/or other reasons.

. . . .

g. Special Handling Residents will be housed at the Detention Facility. Residents of Detention Facility Annex determined to be Special Handling Inmates by the Adjustment Committee will be transferred to maximum security unit, Detention Facility for housing.

Special Handling Residents will be granted the same minimum conditions of confinement, as outlined in Service Order 5300.1B, as afforded other residents housed in the Adjustment Unit, Detention Facility.

5. *Effective Date.* This Service Order is effective upon receipt.

15. Operations Procedure 4090.1 provides in relevant part:

I. *PURPOSE:* The purpose of this procedure is to establish definite guidelines for residents requiring special handling and to establish a security classification color code. Also, to define and identify at the time of transfer to any other Facility and/or those residents who are housed in this Facility that are considered and classified in one of the following categories:

    A. SEPARATION ORDERS
    B. PROTECTIVE CUSTODY
    C. THREAT TO OTHERS
    D. ESCAPE RISK
    E. THREAT TO SELF
    F. SPECIAL HANDLING

. . . .

D. *ESCAPE RISK:*

1. Has a history of perimeter escapes from any Facility of the D.C. Department of Corrections, or any other confinement Institution.

2. Any other "Extreme Example" of breach of security used to escape.

3. Prohibitive sentence structure.

F. *RESIDENTS REQUIRING SPECIAL HANDLING:*

1. Any resident that is classified for special handling from either of the categories listed will be those residents considered to be "Extreme Examples".

2. Any explanation of "Extreme Examples" of any of the previously listed Security Classification Categories may be defined as residents that fall into one of the following groups:

1. Serious Security Problem.

2. Cases where a resident's life is in great danger.

3. Very highly emotional residents.

4. Well known "Escape Artists".

5. Any case, regardless of category, which presents itself at the time, facts, circumstances, evidence, and time factor, may be considered falling within the purview of this conation [sic] "Extreme Example".

IV. *ACTION*

. . . .

C. *SPECIAL HANDLING CASES:*

1. All Cases of "Special Handling" will have two (2) tabs, one (1) designating Security Classification and second tab "Special Handling".

2. Whenever a resident has been classified as requiring "Special Handling", he will *NOT BE MOVED TO ANY* other Institution or Fa-

definite guidelines for residents requiring special handling ...."

The critical question of whether Lucas had a protected liberty interest must be answered in two parts: (1) Is the absence of a statute or published regulation, as opposed to an *official written policy directive*, fatal to plaintiff's due process claim? If not, (2) does either Service Order 5000.1 governing Special Handling at the D.C. Detention Facility or Division Operation Procedure 4090.1 governing Lorton contain substantive limitations on official discretion sufficient to create a liberty interest? These issues were *not* litigated before the district court.

Our discretion to decide on appeal issues not reached below should be exercised with caution and an attentive eye to the peculiar circumstances of each case. *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In this instance it is true that both parties in oral argument, and the government on brief, addressed the question of whether Lucas had a protected liberty interest; the danger that either side would be unfairly surprised by a ruling on this issue is minimal. Nevertheless, we are hesitant to decide a question not litigated below—even to uphold the judgment—where its resolution would be materially assisted by the development of a factual record and the district court's conclusion thereupon.[16]

On balance, we conclude that the first question—whether the absence of a statute or published regulations is dispositive of plaintiff's claim—is a purely legal issue that does not turn on any facts or circumstances peculiar to this case; insofar as it has been argued on appeal by both sides, it can be decided now. On the other hand, we decline to take the next step and decide whether the particular regulations before us create a liberty interest. We conclude that a more fully developed record is needed to elucidate the status and significance of those regulations.

A.  **Step One: Intrainstitutional Regulations in Liberty Interest Determinations**

The D.C. officials, joined by the dissent, contend that internal prison directives such as Service Order 5000.1 and Division Operations Procedure 4090.1 are not the kind of regulations that can create a protected liberty interest. They argue that plaintiff's claim is necessarily foreclosed because neither the D.C.Code nor any published regulations of the Department of Corrections limit the discretion of prison officials. We disagree.

Long before *Hewitt*, the Supreme Court announced often, albeit in dicta, that the state could create a liberty interest not only by statutory restrictions on official discretion but by administrative rules and regulations. *See, e.g., Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458,

cility without the notification and approval of the Assistant Director for Operations, except in cases of *emergency nature*.

3. Whenever taken out of his housing unit for any reason, the resident must be under *constant Correctional Supervision*, and is to be maintained in *full restraints* unless otherwise authorized by the Assistant Director for Operations.

....

V.  *RESPONSIBILITY:*

A. It will be the responsibility of the Shift Supervisors on duty to identify, at the time of transfer to any other Facility, those residents in Security Classification Status. This will be done as follows:

....

3. For those residents considered to be an "Extreme Example" of any of the five catego-

ries spelled out in this procedure, and require "Special Handling," the following Officials will be notified: [Listing officials]

....

8. All recommendations by the Committee must be approved by the Administrator and the Superintendent of Correctional Services before becoming final.

VI.  *RESTRICTIONS:* No changes will be made of any Security Classification without the approval of the Administrator.

VII.  *EFFECTIVE DATE:* This Procedure is effective upon receipt.

**16.**  *See, e.g., Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Wilson v. St. Louis-San Francisco Ry. Co.,* 673 F.2d 1152, 1155 (10th Cir.1982); *International Union, UAW, et al. v. National Right to Work Legal Defense & Educ. Found., Inc.,* 590 F.2d 1139 (D.C.Cir.1978).

465, 466, 101 S.Ct. 2460, 2464, 2465, 69 L.Ed.2d 158 (1981) ("The ground for a constitutional claim must be found in statutes or other rules defining the obligations" of prison authorities; here, "there are no explicit standards by way of statute, regulation or otherwise"); *id.* at 467, 101 S.Ct. at 2465 (Brennan, J., concurring) ("respondents must show—by reference to statute, regulation, administrative practice, contractual arrangements or other mutual understanding—that particularized standards or criteria guide the State's decisionmakers."); *Vitek v. Jones,* 445 U.S. 480, 489, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980) (approving district court's reliance on "objective expectation, firmly rooted in state law and official Penal Complex practice"); *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976) (referring to absence of regulations governing transfer of prisoners). *Cf. Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976) (state may create procedural rights "whether by statute, by rule or regulation"). Admittedly, the Court has not decided precisely what kind of administrative pronouncement is necessary or sufficient to create a protected liberty interest.

This court has not previously squared off on the issue either. *Cf. Smith v. Saxbe,* 562 F.2d 729, 734 (D.C.Cir.1977) (no liberty interest in furlough where statute and regulations give unfettered discretion); *Curry-Bey v. Jackson,* 422 F.Supp. 926, 932 (D.D.C.1976) ("At the very least, it would seem that a practice of prison officials would have to be manifested in a written policy statement" to give rise to liberty interest). Other circuits, however, have. Those that confronted the issue before *Hewitt* were virtually unanimous that official prison policy statements could place substantive limitations on official discretion that gave rise to a liberty interest under the due process clause.

The Seventh Circuit, for example, reversed the district court's dismissal of a prisoner's complaint on the basis of the prisoner's allegation that "prison authorities customarily do not interfere with one's work-release status unless the participant violates some rule of the program or of his work-release contract." *Durso v. Rowe,* 579 F.2d 1365, 1371 (7th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). The court there held that a protected liberty interest may be created by "official policies or practices." *Id.* at 1369. *See also Shango v. Jurich,* 681 F.2d 1091, 1099 (7th Cir.1982) (reaffirming *Durso* on this point); *Arsberry v. Sieloff,* 586 F.2d 37, 47 (7th Cir.1978) (directing district court on remand to consider effect of "intra- and inter-institutional directives containing guidelines for allowing and denying compensatory good-time"). The Fifth Circuit declared that "even if a State by statute or regulation explicitly refuses to grant inmates certain liberty interests, practices of a state may nevertheless give rise to those same liberty interests." *Parker v. Cook,* 642 F.2d 865, 876 (5th Cir.1981). The Sixth Circuit found a protected liberty interest arising from policy statements issued by the Bureau of Prisons and the warden of a federal facility, drawing no critical distinction between the two, but noting that neither had been published in the Federal Register or otherwise incorporated in a body of federal regulations. *Walker v. Hughes,* 558 F.2d 1247, 1254–56 (6th Cir.1977). *See also Bills v. Henderson,* 631 F.2d 1287, 1289 (6th Cir. 1980) (finding liberty interest based on rule contained in "Adult Service Policies and Procedures Manual of the Department of Correction (Guidelines)"). Similarly, the Tenth Circuit found a protected liberty interest in an "official statement of policy" in a manual adopted by the administrator of one particular state penitentiary. *Gurule v. Wilson,* 635 F.2d 782, 785 (10th Cir. 1980).[17] Only the Fourth Circuit, in *Gor-*

---

**17.** *See also Winsett v. McGinnes,* 617 F.2d 996, 1006–07 (3d Cir.1980) (en banc), *cert. denied sub nom. Anderson v. Winsett,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981) (though considering effect of statewide regulations, declar-

ing that "under *Durso,* the Due Process Clause may be triggered in a work release program not only by statutorily created rights, but also by official policies or practices"); *Dumschat v. Connecticut Bd. of Pardons,* 618 F.2d 216, 219

*ham v. Hutto,* 667 F.2d 1146, 1148 (4th Cir.1981), had expressly held, over a strong dissent, *id.* at 1148–51, that apparently statewide "prison policy guidelines are not a sufficient basis for affording state prisoners a liberty interest." It has now overruled that decision as inconsistent with *Hewitt. Hayes v. Thompson,* 726 F.2d 1015 (4th Cir.1984).

It is apparent from this review of circuit law that, certainly before *Hewitt,* the courts did not generally look to whether administrative statements of policy and procedure were promulgated and published as statewide regulations. Instead, the courts followed a more functional approach, focusing their inquiry on whether the administrative pronouncements placed substantive limits on the discretion of prison officials. The government persists, however, arguing that *Hewitt* and *Olim* require more; in effect, the government reads those cases as overruling *sub silentio* the circuit courts' virtually unanimous view that official practices, embodied in explicit written pronouncements, can give rise to a protected liberty interest. We find this an untenable reading of *Hewitt* and *Olim.*

The atmospherics of *Hewitt* do support a cautious approach to prisoners' due process claims. The Court stressed that daily operation of the prison system was to be left primarily to prison officials, and that "regulations structuring the authority of prison administrators may warrant treatment, for purposes of creation of entitlements to 'liberty,' different from statutes and regulations in other areas." 103 S.Ct. at 871. Furthermore, the Court distinguished decisions such as those imposing administrative segregation from decisions concerning good time credits, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), parole, *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), transfer to a mental institution, *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), or other decisions that radically transformed the nature or length of time of a prisoner's confinement. *Id.* at 870. The Court appears to have been particularly concerned in *Hewitt* that courts not unduly interfere with the authority of prison administrators to deal with emergency conditions involving the imminent threat of riot,[18] not a concern in this case. Atmospherics do not overrule solid circuit court precedent, however, and those courts that have revisited the question after *Hewitt* have continued to view intrainstitutional rules and regulations as sufficient to give rise to a liberty interest. *See, e.g., Lyon v. Farrier,* 727 F.2d 766 (8th Cir.1984) (per curiam) (examining "Inmate Policy and Procedure Statements," but finding no substantive limits on discretion therein); *Dudley v. Stewart,* 724 F.2d 1493 (11th Cir.1984) (liberty interest may arise from "constitution, statute, regulation, rule, or practice").[19] We see nowhere

(2d Cir.1980), *rev'd on other grounds,* 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) (liberty interest "may ... be based on regulations, policies, understandings, contractual arrangements or institutional practices"). The Second Circuit in *Dumschat* held that the substantial statistical likelihood that a Connecticut prisoner serving a life sentence would be granted a pardon at some time created a protected liberty interest. The Supreme Court reversed, holding that no liberty interest arose in the absence of explicit substantive standards by which pardon decisions were to be made "by way of statute, regulation, or otherwise." 452 U.S. at 466, 101 S.Ct. at 2465.

**18.** *See* 103 S.Ct. at 867 (facts of prison disturbance); *id.* at 870 n. 5 (distinguishing *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163

(1980) (per curiam), because "In *Rowe* ... '[t]here [was] no suggestion in the record that ... emergency conditions' existed and the prisoner's 'offense did not involve violence.' ").

**19.** *See also Riley v. Smith,* 570 F.Supp. 522, 528–29 (E.D.Mich.1983) (liberty interest if rules protected inmates from administrative segregation); *Martin v. Foti,* 561 F.Supp. 252, 258 (E.D. La.1983) (relying in part on Orleans Parish Prison Rules and Regulations); *Persico v. Gunnell,* 560 F.Supp. 1128 (S.D.N.Y.1983) (noting that "official prison policy," not just statutes and regulations, can create liberty interest). *Cf. Hayes v. Thompson,* 726 F.2d 1015 (4th Cir. 1984) (overruling, in light of *Hewitt, Gorham v. Hutto,* 667 F.2d 1146 (4th Cir.1981), which had held statewide prison regulations insufficient to create liberty interest); *Jones v. Mabry,* 723 F.2d

in *Hewitt* nor in *Olim* any indication that the Court intended, contrary to its repeated dicta, to limit the source of liberty interests to statutes and statewide regulations, and to bar claims based on official directives duly promulgated by the administrators of a particular facility to govern future decisionmaking.

We agree with the conclusion reached by every circuit that has squarely considered the issue that a prisoner may acquire a protected liberty interest by virtue of official policy statements or regulations duly promulgated by administrators of the particular institution at which the prisoner is confined. The Supreme Court has set out a single requirement for prisoners claiming the existence of a state-created liberty interest: "An inmate must show 'that particularized standards or criteria guide the State's decisionmakers.'" *Olim*, 103 S.Ct. at 1747 (*quoting Connecticut Board of Pardons*, 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, J., concurring)). *See also Hewitt*, 103 S.Ct. at 871. We do not believe that prison officials charged with a particular decision having a significant impact on a prisoner's conditions of confinement are necessarily free to ignore standards or criteria that purport to govern the decision solely because they emanate from the director of the institution and are not published, for example, in the D.C. Register. Intrainstitutional regulations may be easier to change than published regulations of state- or district-wide application, but they can nonetheless significantly fetter discretion while in effect.[20]

We therefore reject the dissent's view that anything less than a published regulation is too weak and ephemeral a basis from which to derive a protected liberty interest. We do not regard as ephemeral a binding internal regulation that requires prison officials to apply particular substantive criteria in making a classification decision.

At the same time, it is clear that not every internal memorandum or other pronouncement of prison administrators concerning a prisoner classification decision is intended or reasonably understood as an authoritative statement of the criteria by which that decision must be made.[21] Today we decide only that a prisoner may in some circumstances derive a protected liberty interest from prison rules or regulations of less than state- or district-wide application. We conclude therefore that the absence of a district-wide statute or regulation is not necessarily fatal to plaintiff's due process claim. Service Order 5000.1 and Division Operations Procedure 4090.1 may be sufficient, depending on a further explication of their meaning and implementation, to give rise to a protected liberty interest in not being assigned to Special Handling absent certain substantive predicates.

B. *Step Two: The Effect of Service Order 5000.1 and Division Operations Procedure 4090.1 on Plaintiff's Liberty Interest*

The remaining issue is whether the District of Columbia officials, in promulgating Service Order 5000.1 and Division Operations Procedure 4090.1, have placed sub-

---

590 (8th Cir.1983) (holding memorandum from prison warden insufficient because it was not "a prospective statement setting forth the conditions under which inmates would or would not be classified as [High Security Risk] in the future"). *But cf. Johnson v. Stark*, 717 F.2d 1550, 1551 (8th Cir.1983) (per curiam) (no liberty interest where statute doesn't limit discretion; no other source considered).

20. For example, it is a familiar principle of federal administrative law that agencies may be bound by their own substantive and procedural rules and policies, whether or not published in the Federal Register, if they are intended as mandatory. *See, e.g., Jolly v. Listerman*, 672

F.2d 935, 940 (D.C.Cir.), *cert. denied*, 459 U.S. 1037, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982); *Paige v. Harris*, 584 F.2d 178, 184–85 (7th Cir.1978); *Doe v. Hampton*, 566 F.2d 265, 281 (D.C.Cir. 1977) (remanding for determination of whether guidelines in Personnel Manual "mandatory or precatory"); *Mazaleski v. Treusdell*, 562 F.2d 701, 717–19 (D.C.Cir.1977).

21. *See, e.g., Jones v. Mabry*, 723 F.2d 590 (8th Cir.1983); *Garza v. Miller*, 688 F.2d 480, 486 (7th Cir.1982), *cert. denied*, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983). *Cf. Jolly v. Listerman*, 672 F.2d at 941 (in personnel context); *Doe v. Hampton*, 566 F.2d at 281 (same).

stantive limitations on the discretion of prison officials to place a prisoner in Special Handling so as to give rise to a protected liberty interest, or whether they have left the decisionmaker free to "deny the requested relief for any constitutionally permissible reason or for no reason at all." *Olim*, 103 S.Ct. at 1747. *See also Dumschat*, 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, J., concurring); *Meachum v. Fano*, 427 U.S. at 228, 96 S.Ct. at 2540.

The documents before us set out definite procedures by which Special Handling decisions must be made.[22] However, unlike the statute and regulations discussed in *Hewitt*, Service Order 5000.1 and Operations Procedure 4090.1 grant the prisoner no procedural rights whatsoever in connection with the Special Handling classification. Thus it is clear that the petitioner here cannot make the precise showing that was held sufficient in *Hewitt*: "language of an unmistakably mandatory character requiring that certain procedures 'shall,' 'will,' or 'must' be employed, ... and that administrative segregation will not occur absent specified substantive predicates." 103 S.Ct. at 871. However, it is also clear from the Supreme Court's discussion in both *Hewitt* and *Olim* that the Court did not intend to make the existence of procedural rights a prerequisite to finding a liberty interest protected by the due process clause. As the Court stated in *Hewitt* with regard to state-created procedural rights, "[i]t would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny of the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause." *Id.* The Court further clarified its reasoning in *Olim*, in which it rejected the contention that the existence of procedural rights was sufficient to create a liberty interest:

The Court of Appeals thus erred in attributing significance to the fact that the prison regulations require a particular kind of hearing before the administrator can exercise his unfettered discretion. As the United States Circuit Court of Appeals for the Seventh Circuit recently stated in *Shango v. Jurich*, 681 F.2d 1091, 1100–1101 (1982), "[a] liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality." Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a substantive claim of entitlement.

103 S.Ct. at 1748 (footnotes omitted).

A holding that the existence of state procedural rights was a *prerequisite* to establishing a due process claim would achieve the ironic result eschewed in *Hewitt* as readily as would a holding that such rights were *sufficient* to establish due process rights. Thus, the Supreme Court's recent decisions indicate that, although the existence of explicit mandatory procedural requirements may contribute to the creation of a liberty interest, such requirements are neither sufficient nor necessary.

■ The key to determining whether the state has created a liberty interest giving rise to a due process claim is whether it has set out explicit substantive criteria on which the decisionmaker must base the imposition of restrictions or the withholding of benefits. We do not believe it appropriate to decide this issue on the scanty record before us. A precipitous decision would have too many implications for future cases. We therefore deem it necessary for such a decision to have both a more complete factual record and the considered judgment of the district court as to what Special Handling is and how prisoners are assigned to that category.[23]

---

**22.** *See supra* notes 14 & 15.

**23.** *Cf. Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir.1977) (remanding to district court to determine whether provision of Personnel Manual is

binding because decision turns on "the Commission's intent in authoring it, as ascertained by an examination of the provision's language, its context, and any available extrinsic evidence").

Our knowledge of how the Special Handling decision is made is far from complete. For instance, we do not know whether Order 5000.1 and Procedure 4090.1, the latter of which appeared for the first time in the record as an attachment to the government's brief to this court, are the only authoritative institutional regulations that bear upon the Special Handling decision, or in the case of the D.C. Detention Facility, the decision to place an inmate in the Adjustment Unit.[24] Nor do we pretend to understand fully the significance of "Service Orders" and "Division Operations Procedures" within the prison administration. Although it appears that they are compiled in some organized form, we do not know whether they are available to prisoners themselves or are solely for internal use. In addition, we do not know how the two directives before us have been customarily interpreted during their six or more years of operation, and whether they have been read by officials and/or prisoners as limiting the discretion of the ultimate decisionmakers—the Adjustment Board at the D.C. Detention Facility and the Administrator and the Superintendent of Correctional Services at Lorton—or whether they are interpreted merely as guidelines for frontline officials making the initial decision.[25] Such information would be essential in determining whether either document we have in hand actually limits the discretion of prison officials to place a prisoner in Special Handling, and therefore gives rise to a protected liberty interest.

C. *The Qualified Immunity Defense*

There is still another reason not to decide at this stage of the proceedings whether Lucas had a liberty interest: it may not be ultimately necessary to decide the issue at all. The only remaining claims in this case are for damages. Plaintiff will almost certainly be faced with a defense of qualified immunity from D.C. officials claiming that the constitutional right allegedly violated was not clearly established at the time of the conduct at issue. Consideration of such a defense, the success of which would dispose of Lucas' remaining claims, need not necessarily await a final determination of whether a liberty interest exists.

The Supreme Court has shaped a qualified immunity defense that is based on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). *See also Zweibon v. Mitchell,* 720 F.2d 162, 168 (D.C.Cir.1983). In this case, the availability of the qualified immunity defense may well turn in part on the state of the law about what kind of official pronouncement can give rise to a protected liberty interest. Although we hold today that the state may create a liberty interest protected by the due process clause even in the absence of a statute or district-wide regulation containing substantive limitations on official discretion, that holding by no means dictates the conclusion that the adequacy of these alternate sources of due process rights was clearly established at the time of the challenged conduct so as to defeat a claim of qualified immunity. For instance, the absence of a square holding either way by the Supreme Court, this court, or the D.C. district court could weigh more heavily in deciding the qualified immunity issue than it does in our decision on the merits of this legal issue.

We once again decline to define precise standards for determining what constitutes

---

**24.** Since Special Handling inmates must be placed in the Adjustment Unit, *see supra* note 14, we assume that any substantive or procedural prerequisites to such placement must be met in Special Handling cases.

**25.** We note, as one factor weighing in favor of finding a liberty interest in these regulations, the fact that they identify primarily past conduct and occurrences capable of objective determination. The subjective and predictive nature of the criteria in *Jones* was one of the factors relied on by the court in refusing to find a protected liberty interest. *Jones v. Mabry,* 723 F.2d 590 at 593 (8th Cir.1983). The same factor was noted as a reason for hesitation in *Hewitt,* 103 S.Ct. at 871, but the Court found a liberty interest nonetheless.

"clearly established law," *cf. Zweibon v. Mitchell*, 720 F.2d at 169, especially here where the qualified immunity defense has not yet been pleaded and is not before us. However, if such a defense is asserted, the district court must inquire and perhaps even decide promptly whether the state of the law at the time of the challenged conduct was such that a conscientious prison administrator could reasonably believe that the conduct was consistent with the prisoner's constitutional rights—in this case, that no liberty interest, and thus no due process rights, could be implicated by the Special Handling decision in the absence of a D.C. statute or published regulation. If so, then the defendants are entitled to judgment without further inquiry. *See id.* at 168.

## IV. CONCLUSION

We affirm the district court's dismissal of Lucas' claims against officials at the federal penitentiary. In addition, we affirm the dismissal of his claims under the eighth amendment and the equal protection clause, and any remaining claims for injunctive relief against District of Columbia prison officials. However, we reverse the district court's dismissal of Lucas' claims for damages for the violation of his procedural due process rights, and remand for further proceedings not inconsistent with this decision.

*So ordered.*

STARR, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's careful opinion in principal part, but I respectfully dissent from the analysis of the due process claim in Part III.

The basis for my disagreement can be simply and briefly stated. For the Due Process Clause to be triggered, Mr. Lucas must demonstrate that the corrections authorities' treatment of him under the administrative rubric of "Special Handling" implicates a "liberty" interest. The question to be resolved in this case is whether, absent a state statute or regulation implementing a statutory directive, a liberty interest can arise from a prison administrator's adoption of a procedure to guide the actions of corrections authorities within the institution. While the majority appropriately refrains from deciding whether the administrative procedures relied upon here in fact create such an interest, it nonetheless holds that such procedures can create "liberty" protected by the Constitution.

In my view, constitutionally protected liberty interests are not so ephemeral that they may be created or obliterated in the unfettered discretion of a prison administrator or warden. Rather, there must be some root in the corpus of state or federal law for the interest to be created in the first instance. In this case, it is conceded that no federal or District of Columbia statutes create any interest or expectancy on the part of inmates in remaining in the general prison population and avoiding the administrative category of "Special Handling." Moreover, nothing in the published regulations of the District of Columbia filling in the interstices of statutory law confers upon inmates any interest in avoiding this status. Rather, the classification of "Special Handling" is an administrative device developed by prison officials charged with the difficult and dangerous task of administering the daily operations of the District of Columbia correctional institutions.

The source of Mr. Lucas' claimed interest is thus to be found in the internal management documents of the two institutions where he had been, until recently, incarcerated. With all respect to the majority, that foundation is, in my judgment, simply insufficient to support a constitutionally protected liberty interest. The incongruity of divining liberty interests in such documents is apparent, since these appointed officials are not required by law or regulation to develop such directives for administrative convenience, but may in their complete discretion decide whether to do so. Nor could it seriously be maintained that the abrogation of the liberty interest claimed here would have required anything beyond a written revocation of the administrative

procedure, without notice or opportunity to comment by the prison's resident population.

An internal management document would thus, as a matter of theory, manifestly seem a weak reed on which to build a constitutionally protected liberty interest. Such an approach, however, is not only conceptually weak, it is also inconsistent with the Supreme Court's pronouncements in the area. The majority canvasses a substantial body of lower court case law dealing with the issue whether liberty interests under state law may be found in policies or procedures that do not rise to the level of statutes and implementing regulations. These cases, however, almost uniformly rely upon the line of Supreme Court precedent dealing with property interests. Although the liberty and property interest analyses are parallel in that both require courts to examine state law in determining whether a protectable interest has been created, the Court has made it clear that the sources of state-created property interests are not completely congruent with those that may give rise to liberty interests. In *Jago v. Van Curen,* 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981), for example, the Court held that an Ohio Adult Parole Authority decision to grant a prisoner early parole did not give rise to a liberty interest. *Id.* at 21, 102 S.Ct. at 35. In doing so, it rejected the Court of Appeals' reasoning that the Parole Authority decision represented a "mutually explicit understanding," thereby creating a liberty interest. *Id.* at 18–20, 102 S.Ct. at 34–35. The Court of Appeals, indeed, had expressly relied on the Supreme Court's statements in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), that "property denotes a broad range of interests that are secured by 'existing rules or understandings.'" *Perry,* 408 U.S. at 601, 92 S.Ct. at 2699. The Court, in holding that no liberty interest existed, reasoned that principles which may be helpful in determining whether a property interest exists do not always "lend themselves to

determining the existence of ... liberty interests." *Jago, supra,* 454 U.S. at 18, 102 S.Ct. at 34.

More recently, the Court's holding in *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) seems to me by its terms to conclude that more than a "careful procedural structure" is required to create an interest protected by the Due Process Clause. Rather, the Court in that case looked to state statutes and their implementing regulations in determining that the state "has gone beyond simple procedural guidelines." *Id.* at 871. *Hewitt's* emphasis upon state law, rather than procedural guidelines as the source of liberty interests, is entirely consistent with the Court's prior holdings. Thus, in *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), the Court concluded that to create a cognizable liberty interest, there must be "some right or justifiable expectation rooted in state law ...." So too, in *Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976), the Court observed that in the seminal case of *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), "[t]he liberty interest protected in *Wolff* had its roots in state law ...." And, true to the later readings of its holding, the Court in *Wolff* concluded that a liberty interest could arise "even when the liberty itself is a statutory creation of the State." 418 U.S. at 558, 94 S.Ct. at 2976.

With all deference, I cannot treat the teachings of *Hewitt* and *Jago,* building as they do upon the language in *Wolff, Montanye* and *Meachum,* as amounting only to atmospherics, particularly where such grave doctrinal difficulties flow from a rule of law that would create apparitional rights not from state or federal law but from a mere internal administrative procedure which could disappear in the twinkling of an administrator's eye and the stroke of a revocatory pen.

I therefore respectfully dissent as to the majority's holding with respect to the reach of the Due Process Clause.