723 F.2d 590
 Larry Wayne JONES, Ronney David Briggs, Jerry Wayne McKee,
Terry Gene Howell, and Dennis Earl Jordan, Appellants,
v.
James MABRY and Vernon Housewright, former Directors,
Arkansas Department of Correction, A.L. Lockhart,
Director, and Jerry Campbell, Ronald
Dobbs, and Henry Cowan, Appellees.
 No. 82-2439.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 3, 1983.*
Decided Nov. 30, 1983.
Rehearing Denied Dec. 29, 1983.
 
 H. Edward Skinner, Little Rock, Ark., for appellants.
 Steve Clark, Atty. Gen. by C.R. McNair, III, Asst. Atty. Gen., Little Rock, Ark., for appellees.
 Before BRIGHT, ARNOLD and FAGG, Circuit Judges.
 ARNOLD, Circuit Judge.
 
 
 1
 Larry Wayne Jones, Ronney David Briggs, Jerry Wayne McKee, Terry Gene Howell, and Dennis Earl Jordan, inmates of the Arkansas Department of Correction, brought this action for damages and an injunction against the Director and certain employees of the Department. They allege that they were placed in a special High Security Risk (HSR) classification, with privileges substantially curtailed, without a hearing, and that they were thus deprived of their liberty without due process of law, in violation of 42 U.S.C. Sec. 1983 and the Fourteenth Amendment. The District Court[1] held that the placement of plaintiffs in the HSR classification was a reasonable response to a situation legitimately believed by correctional officials to be an emergency, and that neither state law, administrative regulations, nor past practice had created any "liberty interest" entitling plaintiffs, as a matter of federal constitutional law, to a hearing. We affirm.
 
 I.
 
 2
 Our summary of the facts is taken mainly from the recommended findings and conclusions of the Magistrate[2] to whom this case was referred for an evidentiary hearing. The District Court adopted these findings, and they are not clearly erroneous. All five plaintiffs were confined in the maximum-security building, known as the East Building, at the Cummins Unit of the Arkansas State Penitentiary. Late in 1978 Jordan was one of a group of inmates who gathered in the dayroom of the East Building and refused to return to their cells. Guards with shotguns and tear gas had to be called in to restore order. On January 1, 1979, the other four plaintiffs were part of a group who attempted to escape. Hostages were taken, and ten prisoners, including Briggs, McKee, and Howell, managed to get out of the building before being recaptured. After the inmates had all been subdued, Jerry Campbell, then Warden of the Cummins Unit, alarmed at the apparent loss of control over the maximum-security building, created a new high-security-risk classification, applicable only within the East Building. This classification was not referred to in any of the then-extant handbooks or regulations of the Department. It was essentially an ad hoc reaction to what Campbell took to be a danger of spreading mutiny.
 
 
 3
 Campbell convened the Cummins Unit Classification Committee, consisting of five correctional officers, to review the files of all inmates in the East Building. Campbell's memorandum creating the new HSR classification mentioned only one criterion for placement in it--propensity for violence, but he orally advised the Committee that other criteria, arguably distinct, should also be considered, including participation in mutinous activities (here he no doubt had in mind the take-over of the dayroom) and potential for escapes. The Committee placed a number of inmates, including all five plaintiffs here, in the HSR category. As a result, they were forced to wear leg irons and shackles when out of their cells; they were strip-searched whenever entering or leaving their cells; they were required to eat in their cells; and their television, dayroom, work, movie, shower, and exercise privileges were restricted. The classification was to be reviewed by the Assistant Warden every 60 days. The inmates were not allowed to attend the meeting, to call witnesses, or to rebut the Committee's finding that each was an HSR. (Inmates were, however, allowed to be present at the 60-day reviews of their files.) The wearing of leg irons, the most serious of the disabilities imposed, continued until May 16, 1979, for any out-of-cell movement within the East Building, and until October 16, 1979, for movement in the prison yard.[3]
 
 II.
 
 4
 Plaintiffs first argue that they have been deprived of liberty without due process of law, that is, without a hearing at which they could tell their side of the matter.[4] 4] One might think that being required to wear leg irons is a deprivation of "liberty" in anyone's language, and that the only issue should be whether plaintiffs got the process that was due before being subjected to such a "grievous loss." But that has not been the course of recent adjudication by the Supreme Court. It has required that some "liberty interest," created by state law, regulation, or practice, be identified, before passing on to the question of what process is "due." See Meachum v. Fano, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976): "We reject at the outset the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause .... Similarly, we cannot agree that any change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause."
 
 
 5
 To supply this requirement plaintiffs point to p. 74 of the Inmate Handbook in effect in January of 1979. The relevant part reads:
 
 
 6
 Any action which may adversely affect an inmate, such as an increase in security or loss in time-earning status (class), or which lessens an inmate's privileges will be accompanied by due process arrangements.
 
 
 7
 It is hard to disagree with plaintiffs' claim that this provision covered their situation. They did not, by reason of being classified HSR, lose "time-earning status," but they certainly suffered "an increase in security" and a lessening of "privileges." The Supreme Court's recent opinion in Olim v. Wakinekona, --- U.S. ----, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), however, is fatal to this argument. There, the Supreme Court held, in a case dealing with a similar provision in Hawaii's prison regulations, that "an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." Id. 103 S.Ct. at 1748 n. 12. There must be, in addition, some state-created substantive limitation on the prison officials' discretion, a representation, for example, that the HSR classification would be imposed only on the occurrence of certain acts or events. The Inmate Handbook contained no such representation.
 
 
 8
 In their post-argument brief plaintiffs contend, citing Hewitt v. Helms, --- U.S. ----, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), that the needed substantive limitation on official discretion can be found in the terms of the Warden's memorandum creating the HSR classification. This directive indicated that the criterion for placing an inmate in HSR would be "propensity for violence." The State of Arkansas replies that this language is measurably less specific than the Pennsylvania prison regulation held to create a "liberty interest" in Hewitt. We need not pursue that line of argument, because we reject plaintiffs' reliance on the administrative directive for other reasons. The directive was issued on January 5, 1979, after all of the conduct that triggered official action had occurred. It was not, so far as these plaintiffs were concerned, a prospective statement setting forth the conditions under which inmates would or would not be classified as HSR in the future. It was simply an explanation, issued virtually simultaneously with the creation of the new classification and the placement in it of certain inmates, of what the new classification was all about. It could not have created any expectation on which plaintiffs relied. Moreover, the directive did not purport to be and in fact was not an exhaustive statement of the substantive criteria for inclusion in HSR. The Committee considered other factors, for example likelihood of escape, which may overlap with propensity for violence but are not identical to it. It is also important that the decision to place someone in HSR is more a prediction of likely future conduct than a simple finding of specific past conduct. It is thus a kind of decision less susceptible of justification or refutation under specific substantive criteria. On balance, we conclude that under the most recent guidance from the Supreme Court neither the Inmate Handbook nor the Warden's administrative directive created a "liberty interest" entitling plaintiffs to any particular process. It is not claimed that HSR decisions were discriminatory or based on some constitutionally prohibited reason.
 
 III.
 
 9
 Plaintiffs next argue that even if the State of Arkansas's prison regulations and practices did not create a liberty interest in their case, they were entitled to due process because the imposition of the HSR classification was intended to punish them. The courts have distinguished between "punitive segregation, including punitive isolation which is imposed by way of punishment for past misconduct," and "administrative segregation[, which] is not punitive and ... looks to the present and the future rather than to the past." Kelly v. Brewer, 525 F.2d 394, 399 (8th Cir.1975). "It is safe to say that in all prisons, except perhaps some extremely minimum security institutions, it is found to be absolutely necessary for a number of non-punitive reasons to segregate individual inmates from the general prison population, and to hold them in segregated status for varying or indefinite periods of time." Ibid. As long as there is a procedure for reviewing periodically the situations of inmates who are in administrative segregation, see id. at 400, and there was such a procedure with respect to the HSR classification, due process is satisfied, and no pre-deprivation hearing is required by the federal constitution. If, on the other hand, an inmate is deprived of privileges or placed in a special confinement status in order to punish him for past misconduct, then due process requires some kind of hearing beforehand. Just as pretrial detainees "may not be punished prior to an adjudication of guilt in accordance with due process of law," Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979), so inmates who have been duly convicted of crime may not be subjected to additional punishment, not contemplated in their sentence of imprisonment, without due process of law.
 
 
 10
 It is not always easy to distinguish between "punishment" and the imposition of disabilities for administrative or regulatory purposes. An inmate who is forced to wear leg irons every time he leaves his cell may well regard his condition as punishment. The Supreme Court has set out the following test for distinguishing punishment from administrative or regulatory action by prison authorities:
 
 
 11
 A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of ... detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon [inmates]. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.
 
 
 12
 Bell v. Wolfish, supra, 441 U.S. at 538-39, 99 S.Ct. at 1873-74 (citations omitted).
 
 
 13
 The District Court held that the action taken in this case was not punitive, and we agree. It needs to be remembered that the East Building is a special facility. It houses three groups of inmates: those condemned to die, those on administrative segregation, and those on punitive segregation for violations of rules of the institution. Thus, all of the inmates in the East Building, by definition, already present special security problems. On September 9, 1978, the inmates in one wing of the building flooded their cells and destroyed the plumbing and fixtures. Later, two inmates escaped by going out the back door. In October 1978, a group of inmates, including the plaintiff Jordan, gathered in the dayroom, refused to return to their cells, and had to be forcibly removed. This series of incidents reached its climax in the January 1, 1979, escape attempt, which included the taking of hostages. We cannot say that the prison authorities' reaction to this situation was excessive or exaggerated. It is for them, not us, to make this sort of decision in the first instance, and the courts should intervene only when complaining inmates have carried the burden of proving a clear excess on the part of the defendant officials. These issues, at bottom, are questions of judgment and degree, and on such questions we should be slow to substitute our judgment for that of the officials who must deal with the situation first-hand.
 
 
 14
 Although courts can no longer remain aloof from inhumane conditions within penitentiaries, the judiciary nonetheless must avoid any attempt to mandate administrative details or requirements. Control of the administrative details of state prisons lies exclusively in the hands of state officials.
 
 
 15
 Goff v. Menke, 672 F.2d 702, 705 (8th Cir.1982).
 
 
 16
 Perhaps the most troublesome aspect of the HSR classification was its indefinite duration. It may be, as plaintiffs argue, that they were kept in leg irons longer than necessary, and that the emergency created by the escape attempt had been successfully dealt with before the HSR classification was finally discontinued. Again, the question is not what we would have done had we been in charge of the Cummins Unit of the Arkansas State Penitentiary in January of 1979. It is easy enough, with hindsight, to criticize the reaction of prison officials. Our task is only to decide whether the Federal Constitution was violated, and we are not persuaded that it was. Under all the circumstances, we believe that the action taken was intended to prevent future escapes and to maintain security within the East Building, and that the means employed were not so clearly disproportionate, when measured against these purposes, as to deserve condemnation as "punitive." Plaintiffs argue, brief for appellants p. 27, that "[t]he adoption of the HSR classification [was] an attempt by prison officials ... to 'gain the upper hand,' that is, to make it easier for them to assert and enforce their authority and dominance over the inmates in the East Building." We cannot disagree with that characterization, but neither can we agree that such a purpose was improper. The security of the building requires that prison officials have control over it. In short, we reject plaintiffs' claim that the HSR classification was imposed as punishment.
 
 IV.
 
 17
 Finally, plaintiffs argue that the conditions to which they were subjected were so harsh as to constitute cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment. Much that we have already said is relevant to explain why we also disagree with this contention. While the measures taken were sharp, even harsh, we cannot agree that they were cruel or barbaric. In Pickens v. Mabry, No. 79-1794 (8th Cir. May 1, 1980) (per curiam), an unpublished opinion, we discussed this same escape incident and the creation of the new HSR classification. That was an action brought by another inmate, not one of the plaintiffs here, involved in the escape attempt. The District Court dismissed Pickens's complaint, and we affirmed. We said, among other things:
 
 
 18
 [T]he leg irons requirement was imposed as a security measure in response to the emergency situation that existed in the Cummins Unit after the events of January 1, 1979. We note that since that time the requirement has been eased considerably, and now Pickens is required to wear them only when he leaves his building. Under these circumstances, the measure cannot be said to be so excessive or barbaric as to constitute cruel and unusual punishment.
 
 
 19
 Slip op. p. 2.
 
 
 20
 Local Rule 8(i) of this Court reads as follows:
 
 
 21
 CITATION OF UNPUBLISHED OPINION. No party may cite an opinion that was not intended for publication by this or any other federal or state court, except when the cases are related by virtue of an identity between the parties or the causes of action.
 
 
 22
 In their briefs before this Court, both sides have cited Pickens and argued its effect. It was also cited by the District Court, understandably enough, since it affirmed a judgment of that very court. We see no impropriety in this use of an unpublished opinion. For one thing, the cause of action asserted in Pickens and that asserted here are identical, so citation of the case by the parties is not a violation of Rule 8(i). For another, the Rule does not say that this Court may not cite its own unpublished opinions, and indeed it would be a curious rule of law that would prevent a court from referring to its past decisions, whether published or not. A fundamental duty of courts of justice is to decide like cases alike, and that duty obtains whether a decision has been mailed to West Publishing Company or not. If we were today to announce a different result with respect to the same HSR classification that was before us in Pickens, we would have a difficult time indeed explaining ourselves to the public and the bar.
 
 
 23
 In any case, and entirely apart from the unpublished opinion in Pickens, we are not persuaded that the measures taken here violated the Eighth Amendment. For reasons already stated, we think they were not so unreasonable or excessive as to be clearly disproportionate to the need reasonably perceived by prison officials at the time. Ordinarily prisoners are entitled to a reasonable amount of exercise, see Campbell v. Cauthron, 623 F.2d 503 (8th Cir.1980), but that rule is not invariable. Here, there were extraordinary circumstances justifying the curtailment for a time of exercise and other privileges.
 
 V.
 
 24
 We thank appointed counsel for appellants for his thorough and persistent representation of their interests. The judgment of the District Court is
 
 
 25
 Affirmed.
 
 
 26
 BRIGHT, Circuit Judge, dissenting.
 
 
 27
 I dissent.
 
 
 28
 I would not reach the merits of this case and would dismiss it as moot. Appellants seek a declaration of rights under the Declaratory Judgment Act, 28 U.S.C. Sec. 2201 (1976),[1] but the relief they are requesting has already been provided by the Arkansas Department of Corrections (ADC).
 
 
 29
 Generally, a case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980), quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). At this time, however, there remains no live controversy for which this court may grant relief. The HSR classification no longer exists, and new regulations pertaining to segregation classifications make declaratory relief unnecessary. Under recently promulgated regulations, prisoners are entitled, unless there is an emergency, to due process protections, including a hearing, before being placed in a segregation classification. Admin.Reg. Sec. 836 (Dec. 20, 1981). In addition, the ADC has adopted regulations restricting the use of leg shackles, handcuffs, and security belts. See Admin.Reg. Sec. 403 (July 31, 1981).
 
 
 30
 Although courts may grant declaratory relief when there is a reasonable likelihood that alleged wrongs will be repeated, see Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974), the recurrence of acts appellants complain of appears unlikely. Given the ADC's new regulations governing segregation classifications, the restrictions attending the HSR classification will in all likelihood not be repeated. See Preiser v. Newkirk, 422 U.S. 395, 402, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1974) (prisoner's complaint alleging transfer from medium security to maximum security prison moot in light of his return to medium security prison); SEC v. Medical Committee for Human Rights, 404 U.S. 403, 406, 92 S.Ct. 577, 579, 30 L.Ed.2d 560 (1971) (case moot when allegedly wrongful behavior could not be expected to recur).
 
 
 31
 If the merits of the case are before us, I disagree with the majority's rejection of appellants' contention that the HSR classification was punitive. Although the decision to classify appellants as high security risks was a reasonable response to the escape attempt of January 1, 1979, I would hold that when the emergency had subsided, the restrictions attending the new classification became punitive. Accordingly, at some point ADC officials could not continue holding appellants under onerous conditions of confinement as HSR prisoners without first affording them due process. Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1978).
 
 
 32
 The conditions of appellants' confinement remind one of the penology of an earlier century. As the magistrate noted,
 
 
 33
 Inmates placed in a high security risk classification were required to wear leg-irons for movement outside their cells; to wear leg-irons and handcuffs when moving outside the East Building and to be escorted by employees. The inmates were strip-searched whenever they entered or left their cells; their doors were checked periodically; they were required to eat their meals in their cells; and television, dayroom, work, movie, exercise and shower privileges were restricted. [Nos. PB-C-80-86, PB-C-80-7, slip. op. at 1-2 (E.D.Ark. Feb. 17, 1980).]
 
 
 34
 In addition, "high risk prisoners were visited in their cells by chaplains, rather than allowed to attend services in the dayroom; * * * [and they] were required to remain in their cells during nightime [sic ] hours." Id. at 7. Appellants were required to wear leg irons during all out-of-cell movement until mid-May 1979, and while exercising in the prison yard until mid-October 1979.
 
 
 35
 In Bell v. Wolfish, the Supreme Court articulated the standard for determining whether restrictions imposed on prisoners are punitive or merely are incident to a legitimate governmental purpose. The Court ruled that "[a]bsent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may be rationally connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' " 441 U.S. at 538 (citations omitted). Under this standard the HSR classification was not punitive so long as it was rationally connected to the prison's legitimate objective of preventing future escapes and restoring order, and so long as it was not excessive in relation to that objective.
 
 
 36
 Prison officials have wide discretion in taking reasonable actions when responding to an emergency, but what they consider to be an emergency cannot be "open ended or time unlimited." Morris v. Travisono, 509 F.2d 1358, 1360 (1st Cir.1975); see also Hoitt v. Vitek, 497 F.2d 598, 600 (1st Cir.1974) (emergencies cease to be emergencies when they continue indefinitely). Although prison officials may have acted reasonably in classifying appellants as high security risks in responding to the emergency caused by the escape attempt, the restrictions imposed became punitive when the emergency subsided and the restrictions became unnecessary to maintain order. Some highly restrictive measures imposed on appellants lasted for more than ten months, long after order was restored to the East Building. Measures unnecessary to prevent future escapes and restore order became punitive at some point after January 1, 1979.
 
 
 37
 Accordingly, I would hold that when the emergency ended in the East Building, appellants should have been afforded a due process hearing before being subjected to the highly restrictive and punitive obligation of carrying shackles and leg irons for movement outside of their cells and their cell block.
 
 
 
 *
 This case was argued on September 13, 1983. The last post-argument brief was filed on October 3, 1983
 
 
 [1]
 The Hon. Garnett Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas
 
 
 [2]
 The Hon. Henry L. Jones, Jr., United States Magistrate for the Eastern District of Arkansas
 
 
 [3]
 The HSR classification no longer exists. Current regulations require a hearing before an inmate is placed in a segregation classification, except in an emergency, and even then a hearing must be held promptly. They also specify substantive criteria for imposing the classification. Admin.Reg. Sec. 836 (Dec. 30, 1981). The predecessor of this regulation has been held to create a federally protected liberty interest. Finney v. Mabry, 528 F.Supp. 567 (E.D.Ark.1981). Thus, plaintiffs no longer need any injunctive relief. They are pursuing this case solely to obtain a money judgment against the officials who placed them in HSR
 
 
 [4]
 It is not clear what good a hearing would have done plaintiffs. They do not deny doing the acts that provoked the creation of the HSR classification. Separate disciplinary proceedings were held, and loss of statutory good time resulted. Plaintiffs were permitted to appear before the disciplinary committee, and they do not now complain that that committee failed to accord them due process. In addition, the plaintiff Briggs was convicted of escape in a state court in connection with the incident on January 1, 1979
 
 
 [1]
 Specifically, appellants seek a declaration that they were entitled to procedural due process before being classified as high security risk (HSR) prisoners, and that the conditions of their confinement constituted cruel and unusual punishment
 Although appellants' complaint also seeks damages and injunctive relief, both remedies are unavailable. Damages are inappropriate because there is no allegation that appellees failed to act in good faith or that they acted in a way that contravened clearly established law. See Villanueva v. George, 659 F.2d 851, 854-55 (8th Cir.1981) (en banc). Injunctive relief is unavailable because the high security risk classification no longer exists and most of the restrictions imposed in January 1979 have been removed.