USCA1 Opinion

 

 December 8, 1992 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ___________________ No. 92-1575 DENNIS R. COOKISH, Plaintiff, Appellant, v. COMMISSIONER, NEW HAMPSHIRE DEPARTMENT OF CORRECTIONS, ET AL., Defendants, Appellees. __________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, U.S. District Judge] ___________________ ___________________ Before Breyer, Chief Judge, ___________ Torruella and Selya, Circuit Judges. ______________ ___________________ Dennis R. Cookish on brief pro se. _________________ John P. Arnold, Attorney General, and Claire L. Gregory, _______________ __________________ Assistant Attorney General, on brief for appellees. __________________ __________________ Per Curiam. The appellant, Ronald Cookish, was an ___________ inmate at the New Hampshire State Prison when a disturbance occurred there in October 1987. In April 1988, Cookish filed an eight-count complaint against the Commissioner of the New Hampshire Department of Corrections, the Warden of the New Hampshire State Prison, and seven corrections officers at the prison. He later amended the complaint to add a ninth count. The complaint alleged that the defendants' actions during and after the disturbance had violated Cookish's rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, and under several provisions of New Hampshire law. The district court dismissed eight of the nine counts, but denied the defendants' request for qualified immunity on the remaining count. The defendants took an interlocutory appeal to this court, challenging that denial. We reversed the district court's decision. Cookish v. Powell, 945 F.2d _______ ______ 441 (1st Cir. 1991) (per curiam). The district court then dismissed the remaining count and entered a final judgment. Cookish appealed, challenging only the dismissal of Counts I and II of his amended complaint. I _ In Count I, Cookish alleged that the defendants had violated his Eighth Amendment rights "by placing him knowingly and willfully into a dangerous, life-threatening -2- situation." On October 23, 1987, a disturbance which Cookish variously described as a "riot" and an "uprising" broke out in the Medium Custody South Unit (MCSU) of the New Hampshire State Prison. The MCSU was made up of four housing sections, or "pods." Cookish resided in Pod 1C, one of two in which the disturbance occurred. However, when the unrest began, Cookish was not in his cell but working in the prison kitchen. By the time he returned to his unit, at about 7:15 p.m., Pod 1C "was being destroyed." Fires were burning, windows, furniture, and light fixtures were being smashed, and threats were being yelled. Corrections officers had been removed from the pod and stationed near the MCSU control room. Cookish did not want to enter the pod while it was in such an uproar, but he was twice instructed to do so, first by a "staff order," and the second time by the MCSU "Control Room Officer." Cookish returned to his cell and locked himself in. He stayed there for the next four hours while "the situation" continued, though he left twice to use the toilet -- once at 9:00 p.m. and once at 10:00 p.m. -- both times without incident. Cookish took no part in the disturbance. He did not engage in violence, was not threatened with violence, and suffered no physical injury. He did claim to have -3- "experienced mental anguish" but gave no details of his torment and supplied no facts to support that conclusion. Prison officials have a duty to protect prisoners from violence at the hands of fellow inmates. Leonardo v. Moran, ________ _____ 611 F.2d 397, 398-99 (1st Cir. 1979). See also Street v. ________ ______ Fair, 918 F.2d 269, 271 (1st Cir. 1990) (per curiam). In ____ some circumstances, a prison official's failure to protect may constitute the "unnecessary and wanton infliction of pain" in which an Eighth Amendment violation accrues. See ___ Ingraham v. Wright, 430 U.S. 651, 670 (1977) (quoting Estelle ________ ______ _______ v. Gamble, 429 U.S. 97, 103 (1976)). ______ The circumstances required for an Eighth Amendment violation include, of course, a sufficient degree of culpability on the part of the defendant. See Wilson v. ___ ______ Seiter, 111 S.Ct. 2321, 2326 (1991) ("Eighth Amendment claims ______ based on official conduct that does not purport to be the penalty formally imposed for a crime require inquiry into state of mind"). The culpability needed to show the unnecessary and wanton infliction of pain varies according to the "kind of conduct against which an Eighth Amendment objection is lodged." Whitley v. Albers, 475 U.S. 312, 320 _______ ______ (1986). Courts deciding failure-to-protect cases have generally held plaintiffs to a burden of showing that the defendants acted with "callous indifference," Estate of Davis v. _________________ -4- Johnson, 745 F.2d 1066, 1071 (7th Cir. 1984), or _______ "deliberate[] indifferen[ce]," Martin v. White, 742 F.2d 469, ______ _____ 474 (8th Cir. 1984), or that they were "wanton, reckless or deliberately indifferent." Lawler v. Marshall, 687 F.Supp. ______ ________ 1176, 1177 (S.D.Ohio 1987). The plaintiff in this case, however, was required to prove more. The typical case involves allegations that prison officials failed to protect a prisoner from the kind of harm that may arise under workaday prison conditions, by, for example, housing him in an area of the prison to which his known enemies have access, Leonardo v. Moran, 611 F.2d at 397-98, or allowing bullies to ________ _____ carry on a campaign of intimidation in prison common areas. Street v. Fair, 918 F.2d at 271. In such cases, a ______ ____ "deliberate indifference" standard is appropriate because the prison official's responsibility to protect the prisoner "does not ordinarily clash with other equally important governmental responsibilities." Whitley v. Albers, 475 U.S. _______ ______ at 320. See also Hendricks v. Coughlin, 942 F.2d 109, 113 _________ _________ ________ (2d Cir. 1991) (protecting inmate from other inmates' violence "ordinarily involves no competing penological policies"). But, this is not the typical case. Here, the correction official who allegedly failed to protect Cookish did so in the course of efforts to restore order to the MCSU under conditions which Cookish himself has described as "riotous." -5- "In making and carrying out decisions . . . to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike." Whitley v. Albers, 475 U.S. at 320. Thus, "[w]hen the 'ever- _______ ______ present potential for violent confrontation and conflagration' ripens into actual unrest and conflict," id. ______ ___ at 321 (quoting Jones v. North Carolina Prisoners' Labor _____ _________________________________ Union, Inc., 433 U.S. 119, 132 (1977)), "the admonition that ___________ 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators' carries special weight." Whitley v. Albers, 475 U.S. at 321 (quoting _______ ______ Rhodes v. Chapman, 452 U.S. 337, 349 n.14 (1981)). ______ _______ "In this setting, a deliberate indifference standard does not adequately capture the importance of [the prison official's] competing obligations," Whitley v. Albers, 475 _______ ______ U.S. at 320, and the plaintiff is required to prove that the defendant acted "maliciously and sadistically for the very purpose of causing harm." Id. at 320-21 (quoting Johnson v. ___ _______ Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). This is a "very _____ high state of mind," Wilson v. Seiter, 111 S.Ct. at 2326, and ______ ______ it sets the standard against which we must measure Cookish's charges. By alleging that the MCSU Control Room Officer ordered him to return to his cell while a riot was in progress, -6- Cookish did lay a factual basis from which one could infer that the officer acted with some degree of culpability. In ____ light of what the complaint also says, and what it does not say, however, we can find no basis from which one could reasonably infer that the officer might have acted "maliciously and sadistically for the very purpose of causing harm." Any possible inference of malice or sadism in this case would rest on the notion that corrections officers had no reason to send Cookish back to his cell other than to cause him injury, or perhaps that the situation in Pod 1C was so violent that to send Cookish into its midst was virtually to condemn him to injury. The complaint can support neither assumption. First, prison officials are normally, and understandably, concerned with accounting for the whereabouts of all prisoners at all times. During periods of unrest, the need to assure that every prisoner is where he is supposed to be escalates in proportion to the level of disturbance. Cookish was supposed to be in his cell. In his cell, he could be accounted for. If he added to the disturbance inside the pod, at least he would not create a new disturbance outside it. Nor would his presence outside the pod divert resources better directed at ending the emergency. The Control Room Officer's insistence that Cookish go his -7- cell and stay in it, therefore, was a rational, if not entirely risk-free, response to the circumstances. If it was not benign, then it certainly was not malicious. We note, moreover, that Cookish rode out the riot safely in his locked cell, from which he felt comfortable enough to emerge to relieve himself not once but twice in a four-hour period. Indeed, as far as the complaint reveals, the "riot" involved considerable property damage but no violence or injury to any person. All of this suggests to us that the pod, though in upheaval, was not a free-fire zone, and that the Control Room Officer's instruction was intended only to accomplish what it did in fact accomplish: it put Cookish in a location where he would be relatively safe and easily accounted for. Finally, Cookish's only allegation of harm was a conclusory assertion of mental anguish, unsupported by any facts. Such allegations are inadequate to establish that the defendants' failure to protect him from a risk of violence rose to the level of an Eighth Amendment violation. See ___ Street v. Fair, 918 F.2d at 271-72; Leonardo v. Moran, 611 ______ ____ ________ _____ F.2d at 399. We therefore affirm the dismissal of Count I. II __ In Count II, Cookish complained about the conditions in which he and the other inmates of the rebellious pods were housed for some sixty hours after the disturbance ended just -8- before midnight on October 23. The inmates, Cookish among them, were escorted to an old, unused cellblock. They were strip-searched. The guards took their jackets and thermal underwear, and did not return them, although the night was chilly with temperatures dipping just below freezing. Cookish was taken to a cell that had no heat and no bedding. He asked for a mattress, sheets, blankets, and his jacket, but the guards denied his request "for the time being." Cookish remained in this cell until just after noon on October 26, when he returned to Pod 1C. He received a mattress and a blanket on the afternoon of October 24, but was denied a sheet and his jacket, a towel and soap. There was no heat. The cell had a toilet, and a sink that ran only cold water. Cookish was fed, but at least one of his meals consisted of a "plain peanut butter sandwich on hard bread." As a result of this ordeal, Cookish suffered "headaches, sinus problems, chills [and] fever." Although "[n]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual," Rhodes v. Chapman, 452 U.S. 337, 346 (1981), the ______ _______ Supreme Court has said that "extreme deprivations are necessary to make out a conditions-of-confinement claim. Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure -9- of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. ______ McMillian, 112 S.Ct. 995, 1000 (1992) (citations omitted). _________ The objective component of an Eighth Amendment claim, moreover, is "contextual." Id. Conditions that might be ___ deemed cruel and unusual if they were permanent features of a prisoner's life, may not offend the Constitution if they are imposed only temporarily. "A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." Hutto v. Finney, 437 _____ ______ U.S. 678, 686-87 (1978). By the same token, prison officials may be justified in subjecting prisoners to more rugged conditions of confinement during and after an emergency than would be constitutionally permissible in peaceable circumstances. "[R]esponse to emergency situations in a prison environment necessarily entails curtailment of rights and privileges of the inmate population." La Batt v. Twomey, 513 F.2d 641, 648 (7th Cir. _______ ______ 1975). In assessing the constitutionality of conditions imposed in response to an emergency, courts have asked whether the conditions were "so unreasonable or excessive as to be clearly disproportionate to the need reasonably perceived by prison officials at the time." Jones v. Mabry, _____ _____ 723 F.2d 590, 596 (8th Cir. 1983). A "viable complaint challenging a post-emergency lockup must allege nothing less ______________ -10- than the continued deprivation of basic rights or needs for an unreasonable length of time, maliciously, through excessive neglect, or arbitrarily (e.g., without any justification of practical necessity related to prison security)." Hoitt v. Vitek, 497 F.2d 598, 602 (1st Cir. _____ _____ 1974) (emphasis added). Contextual scrutiny exposes the frailty of Cookish's claim. He did not contend that exposure to the cold and deprivation of hygienic amenities were standard conditions of his incarceration. These privations existed, by Cookish's account, for no more than sixty hours, and they were imposed in the wake of a disturbance that Cookish himself described as a "riot" in which his fellow inmates had caused considerable damage to their permanent accommodations. In the period following the riot, the prison officials whom Cookish accuses of cruel and unusual punishment were, of necessity, faced with two pressing tasks. First, they needed to assure that the prisoners did not lapse into rebellion and violate the peace so recently regained. Thus, some "curtailment of rights and privileges" was to be expected, and was fully justified. Second, they had to repair the damage the prisoners had wreaked on their regular quarters. In the interim, of course, they would have had no choice but to provide alternate housing. It should come as no surprise that the jury-rigged shelter was less comfortable than that -11- to which the prisoners were accustomed. But the Constitution does not require states to keep pristine, commodious cells ready and waiting to house inmates who have damaged or destroyed their primary lodgings. Conditions on the old cell block may well have been unpleasant, but, given the emergency and their short duration, and absent some suggestion that they were imposed unnecessarily and intentionally, they did not amount to an "extreme deprivation" and they were not unconstitutional. Affirmed. ________ -12-