Robbie Del James ROBERSON,
Plaintiff,

v.

Dr. Patrick GOODMAN, Elaine Little,
Tim Schuetzle, and Cathy Bachmeier,
RN, Defendants.

No. A1–02–127.

United States District Court,
D. North Dakota,
Southwestern Division.

Dec. 18, 2003.

Robbie Del James Roberson, pro se, Jamestown, ND, for plaintiff.

Brenda Lynn Blazer, Vogel Law Firm, Jean R. Mullen, Attorney General's Office, Civil Litigation, Bismarck, ND, for defendant.

## ORDER GRANTING STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HOVLAND, Chief Judge.

## I. *BACKGROUND OF THE CASE*

On April 16, 2003, a summons and complaint were served on the Attorney General by the plaintiff, Robbie Del James Roberson ("Roberson"), an inmate under the jurisdiction of the North Dakota Department of Corrections and Rehabilitation. The action was initially reviewed pursuant to 28 U.S.C. § 1915A and the Court found that certain claims could proceed as potentially not frivolous. *See* Order dated March 3, 2003 (Docket No. 14). Those claims are as follows:

1) that Warden Schuetzle ordered that Roberson be placed in and remain in administrative segregation;

2) that Warden Schuetzle allowed guards to slam Roberson's fingers in his cell door;

3) that Warden Schuetzle allowed other inmates to threaten and beat up Roberson;

4) that Warden Schuetzle allowed Roberson to be given Haldol, a medication to which Roberson is allegedly allergic; and

5) that Cathy [sic] Bachmeier gave Roberson overdoses of medications and failed to check for side-effects from Haldol, Zyprex, Serquel, and Risperol.

On October 31, 2003, Elaine Little, Director of the Department of Corrections and Rehabilitation ("DOCR"); Tim Schuetzle, Warden, North Dakota State Penitentiary and Director of Prisons; and Kathleen Bachmeier, Medical Director, North Dakota State Penitentiary ("State Defendants"), filed a Motion for Summary Judgment. On November 28, 2003, Roberson filed a lengthy response to the motion.[1] Roberson did not submit any

---

1. Specifically, Roberson filed correspondence as well as several responsive pleadings entitled as follows: "COMPOSATORY BREECH OF ACTION"; another entitled "UNDER CIVIL RULE 15a(b)c, d" Motion to move for AMENDED AND SUPPLEMENTAL PLEADINGS DIRECTING STRIKE MOTION FOR EMANCIPATION TO DUE PROCESS SUBSTITUTED DEFENDANTS, FOR, INDIVIDUAL CAPACITIES OF SHOW OF RIGHT ORDER, BY THE COURT, TO FILE INDIVIDUAL RESPONSIBLE SIMPLE NEGLIGENCE OF PHYSICAL, MENTAL, EMOTIONAL AN DETRIMENTAL PUNITIVE INJURIOUS DAMAGES BY SLANDEROUS RECORDS RECOVERIES, FOR INFLICTING PRESUMPTUOUS EVIDENCES, TO IMPLICATE INVOLUNTARY MEDICATION BY FALSE JURIS STATE AGENTS, PROXIES.INPUTS.CONTRIBUTING MEDICAL NEGLIGENCE; and a third pleading enti-

medical evidence or testimony in support of his response.

## II. *FACTS*

The plaintiff, Robbie Roberson was committed to the North Dakota State Penitentiary (NDSP) on February 16, 2001, for two counts of terrorizing in Cass County for threatening to kill a Fargo police officer and his family. Affidavit of Timothy Schuetzle, Ex. 1, ¶ 4.

After his incarceration in February 2001, Roberson was placed in Administrative Segregation ("AS") at the North Dakota State Penitentiary in Bismarck because of his reported violence in the county jail where he had previously been held. *Id.* ¶ 8. Roberson remained in Administrative Segregation until November 2002, when he was transferred to the James River Correctional Center in Jamestown, North Dakota. *Id.* ¶ 17. Roberson was housed in Administrative Segregation during the period while he was an inmate at NDSP because of a variety of factors: (1) Roberson was unwilling to go through the orientation process; (2) Roberson refused to meet with the AS Committee to discuss alternative placements; (3) Roberson displayed paranoid characteristics and refused to sign any documents; (4) Roberson displayed uncooperative and sometimes violent behavior; (5) Roberson refused to cooperate with a psychological evaluation; (6) Roberson had numerous disciplinary reports, including numerous disorderly conduct charges; threats towards others (both inmates and staff); possession of contraband (homemade shank twice); possession of other inmates' property; destruction of state property; disobeying staff orders; and foul language. Affidavit of Timothy Schuetzle, Ex. 1, ¶ 9, Attach. 1–1.

On August 7, 2001, Roberson became verbally and physically violent, threatening to kill a correctional officer and his family and throwing things around his cell. *Id.*, ¶ 12, Attach. 1–3. During this incident, Roberson was out of control and the correctional officer was not able to get Roberson to put his hands outside of the food tray door so that he could be cuffed. Roberson attempted on two occasions to reach out through the tray door to punch the correctional officer in the groin. The second time, the correctional officer kicked Roberson's tray door in an attempt to shut it.

As a result of Roberson's inability to control his assaultive behavior on August 7, 2001, and Roberson's evident paranoia and the effect on his behavior, it was recommended that he be subjected to the involuntary medication protocol. *Id.*, ¶ 12. The referral was made by Dr. Benn Haynes, Roberson's treating psychiatrist, after visiting with Roberson on August 7, 2001. The Director of Medical Services, Kathy Bachmeier, sent a notice to the Warden with the referral. *Id.*, ¶ 14, Attach. 1–5. On August 8, 2001, Roberson was provided with a written notice of the hearing, the reason for the hearing, and his rights.

A hearing was held on August 10, 2001. *Id.* The hearing committee members consisted of a psychiatrist, Dr. Cheryl Huber; a nurse, Linda Kosel; and Barb McGillivrary, a Unit Manager. A representative from the Protection and Advocacy Agency represented Roberson at the hearing. The hearing members considered the information available concerning Roberson's behavior, including Incident Reports during Roberson's confinement; a psychological report done by psychologist Dr. Mark Hanlon in November 2000 for purposes of Roberson's trial; a report by Dr. Patrick Goodman, a psychiatrist who had visited with Roberson in July 2001; the August 7,

tled "AFFIDAVIT CIVIL PROCLAMA-TIONS."

2001, psychiatric consultation completed by Dr. Haynes; Roberson's testimony at the hearing indicating considerable delusional thought; and 23 pages of notes that Roberson prepared for the hearing.

At the conclusion of the hearing, the Committee recommended that Roberson undergo treatment as recommended by his psychiatrist, "involuntarily if necessary." This was approved by the Warden. Roberson then appealed the decision to the Director of the DOCR who found the letter of appeal submitted by Roberson supported the committee's findings that he was in need of treatment.

On February 2, 2002, and pursuant to the Involuntary Medication Policy, another hearing was held. Exh. 1, ¶ 15. A determination was made to continue the involuntary administration of medications if Roberson would not take the medications recommended by his treating physician. Roberson appealed this determination to the Director of DOCR and again the Committee's determination was upheld.

On July 12, 2002, another hearing was held and the Committee recommended a continued forced medication policy for Roberson which continued until early November 2002. Roberson has not been forced to take medications since his transfer to Jamestown on November 4, 2002. He has refused to take any medications voluntarily and has generally refused interaction with others. Exh. 1, ¶ 17.

When Roberson was on psychotropic medications from August 2001 through December 2002, he was monitored for side-effects by nurses, his psychiatrist, and the AS staff. *See* Affidavit of Kathleen Bachmeier, Exh. 2 ¶¶ 9, 11–14. None of these individuals observed any adverse reaction by Roberson to the medications nor did Roberson complain of any adverse reactions.

## III. *LEGAL ANALYSIS*

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Graning v. Sherburne County,* 172 F.3d 611, 614 (8th Cir.1999). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. *THE STATE'S USE OF FORCE TO MEDICATE ROBERSON WAS CONSTITUTIONALLY PERMISSIBLE.*

■ A competent adult has the right to refuse medical treatment. *See Cruzan v.*

*Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Courts have based this right on either a common-law right that every individual has the right to determine what shall be done with his own body under the doctrine of informed consent *or* on both the common-law right and constitutional right to privacy. However, the right is not absolute.

In the prison context, courts have weighed the rights of inmates to refuse medical treatment against the state's interest in orderly prison administration. *Washington v. Harper,* 494 U.S. 210, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). In holding that the Due Process Clause permits the state to treat an inmate with anti-psychotic drugs against his will, the United States Supreme Court in *Harper* relied upon earlier decisions to find that the "standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.'" 494 U.S. at 219, 223, 110 S.Ct. 1028.

In *Harper,* the Supreme Court identified the procedures necessary to satisfy due process before an inmate could be medicated involuntarily with anti-psychotic medication. 494 U.S. 210, 232–36, 110 S.Ct. 1028. The Court noted the basic procedural requirements of notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses must be met. The Court also found the Washington state procedures to be appropriate:

> [T]he decisionmaker is asked to review a medical treatment decision made by a medical professional. That review requires two medical inquiries: first, whether the inmate suffers from a "mental disorder"; and second, whether, as a result of that disorder, he is dangerous to himself, others, or their prop-

erty. Under the Policy, the hearing committee reviews on a regular basis the staff's choice of both the type and dosage of drug to be administered, and can order appropriate changes. [Citation omitted.]

494 U.S. 210, 232–233, 110 S.Ct. 1028.

The procedures established at the North Dakota State Penitentiary before an inmate may be involuntarily medicated are nearly identical to those found acceptable by the United States Supreme Court in *Washington v. Harper.* Before involuntary medication can be required, there must be a showing that the inmate suffers from a mental disorder and, as a result of the disorder, constitutes a likelihood of serious harm to that inmate or others, of property destruction, or is gravely disabled. *See* Affidavit of Timothy Schuetzle, Ex. 1, Attach. 4. The procedures for making such a determination comply with the *Harper* requirements. A psychiatrist must find that an inmate needs a psychotropic medication, and the inmate must have refused to take the medication. A notice must then be provided to the Warden and, within 24 hours, the Warden must assign a hearing committee. The committee must be composed of a psychiatrist, another mental health professional, and a unit management staff person. Written notice of a hearing to consider involuntary medication of the inmate must be hand-delivered to the inmate including notice of the reasons for the hearing and the inmate's rights. *Id.* A hearing must be held within 48 hours after the notice is delivered to the inmate. *Id.* The inmate is provided with a staff representative or a social worker to help prepare testimony and assist during the hearing. *Id.* Cross-examination is permitted as appropriate.

The inmate is notified of his right to appeal a decision of the committee to the Director of the Department of Correc-

tions and Rehabilitation. *Id.* Any decision to permit involuntary medication of an inmate must be based on a finding that the inmate is "suffering from a mental disorder and, as a result of the disorder, presents a likelihood of serious harm to himself/herself or others, destruction of property, or is gravely disabled." The decision to permit involuntary medication is made by majority vote, but the psychiatrist on the Committee must be in the majority. Finally, under North Dakota law, an inmate can seek judicial review through habeas corpus relief under N.D.C.C. § 32–22–01; declaratory relief under N.D.C.C. § 32–23–01 (*see State ex rel. Schuetzle v. Vogel*, 537 N.W.2d 358 (N.D.1995)), or through a writ of prohibition under N.D.C.C. § 32–35–02.

These procedures were followed in making the determination that involuntary medication of psychotropic medication should be authorized for Roberson. The referral was made by Dr. Benn Haynes, his treating psychiatrist. The Director of Medical Services sent a notice to the Warden with the referral and Roberson was provided with written notice of the hearing, the reason for the hearing, and his rights. This was delivered to him by the Medical Director who also read to him his rights.

The Committee members consisted of a psychiatrist, a nurse, and a unit manager. A representative from the Protection and Advocacy Agency represented Roberson at the hearing. The hearing members considered the information available concerning Roberson's behavior, including Incident Reports during Roberson's confinement; a psychological report done by psychologist Dr. Mark Hanlon in November 2000 for purposes of Roberson's trial; a report by Dr. Goodman, a psychiatrist who had visited with Roberson in July 2001; the August 7, 2001, psychiatric consultation completed by Dr. Haynes; Ro-

berson's testimony at the hearing indicating considerable delusional thought; and 23 pages of notes that Roberson prepared for the hearing.

At the conclusion of the hearing, the Committee found that Roberson displayed evidence of a thought disorder, and that two separate psychiatrists had recommended treatment. The Committee also found that Roberson had displayed evidence of dangerousness to others, and that his behavior placed him at risk of harm from other inmates. The Committee recommended that Roberson undergo treatment as recommended by his psychiatrist, "involuntarily if necessary." Thereafter, Roberson appealed the decision to the Director of the DOCR by forwarding a copy of the 23–page document he had prepared for the hearing. The Director found Roberson's own letter supported the Committee's findings that he was in need of treatment. The Director supported the Committee's finding that Roberson's behavior placed him at risk of harm from other inmates.

It is clear from the record that Roberson has been accorded the due process that is constitutionally required.

### B. *ROBERSON CANNOT SHOW THAT WARDEN SCHUETZLE ALLOWED HIM TO BE GIVEN MEDICATIONS TO WHICH HE WAS ALLERGIC.*

The Court initially allowed Roberson to proceed with a claim that Warden Schuetzle had allegedly violated his constitutional rights because Schuetzle allowed Roberson to be given Haldol and that Roberson was allergic to the medication. It is clear and undisputed that Warden Schuetzle did not prescribe or dispense any medications to Roberson. *See* Affidavit of Timothy Schuetzle, Ex. 1. Further, Schuetzle neither approved nor agreed

that any particular medication such as Haldol, should be prescribed or administered to Roberson. *Id.* The determination of what medications should be given to Roberson was made by his treating physicians. For this reason, Roberson's claim fails.

At the time the drug Haldol was being administered to him, Roberson never complained of any side-effects or any adverse reaction to the medication. Roberson never complained about any adverse reaction to any medication that was administered to him. The nurses and other staff who observed Roberson daily did not report that Roberson suffered any side-effects or adverse reaction to the drugs. Roberson cannot sustain his burden of proof that he was allergic to Haldol, or suffered any side-effects or adverse reactions because of the medications administered to him.

### C. *ROBERSON CANNOT PROVE THAT HE WAS GIVEN ANY OVERDOSES OF MEDICATIONS OR THAT HE WAS NOT MONITORED FOR ADVERSE EFFECTS.*

■ The Court allowed Roberson to proceed with a claim that Medical Director Kathy Bachmeier allegedly gave Roberson overdoses of medications and failed to check for side effects. As noted above, Roberson had no observable side-effects from the medications nor did he notify anyone of any adverse side-effects. The dosage of Roberson's medication was prescribed by his treating psychiatrists. *See* Affidavit of Timothy Schuetzle, Ex. 1, Attach. 1–2. All of the doses prescribed by the psychiatrists were within the manufacturer's recommended guidelines as published in the Physician's Desk Reference. Roberson cannot prove, and has not shown, that he was prescribed or given overdoses of prescription medications or that he was not monitored for side-effects.

### D. *ROBERSON CANNOT PROVE THAT WARDEN SCHUETZLE ALLOWED OTHER INMATES TO THREATEN OR ASSAULT ROBERSON.*

■ The Court also allowed Roberson to proceed on the claim that Schuetzle had allegedly violated Roberson's constitutional rights because Schuetzle had allowed other inmates to threaten and assault him.

It is well-established that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones...." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Id.* That Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates. This includes protecting "prisoners from violence at the hands of other prisoners." 511 U.S. 825, 833, 114 S.Ct. 1970.

However, not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the inmate's safety. *See Perkins v. Grimes,* 161 F.3d 1127, 1130 (8th Cir.1998) (citing *Prater v. Dahm,* 89 F.3d 538, 541 (8th Cir.1996) and following *Farmer,* and holding that the duty to protect requires only that prison officials take reasonable measure to abate substantial risks of serious harm, of which the officials are aware).

"[A] prison official violates the Eighth Amendment only when two requirements are met." *Farmer,* 511 U.S. 825, 834, 114 S.Ct. 1970. First, the plaintiff must allege that a "sufficiently serious" deprivation occurred. To show a deprivation in a case alleging a failure to protect from harm, the inmate must show that he is "incarcerated under conditions posing a substantial risk of serious harm." *Id.* The second compo-

nent of proving a violation of the Eighth Amendment requires a showing that the prison official acted with deliberate indifference to the inmate's health and safety.

In *Farmer,* the Supreme Court rejected an objective test for "deliberate indifference." Rather, it looked to the subjective knowledge of the defendants, holding:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. 825, 837, 114 S.Ct. 1970.

The Eighth Circuit has held that courts must reject the conclusion that the fact the harm occurred is proof itself of deliberate indifference. *See Rellergert by Rellergert v. Cape Girardeau County, Mo.,* 924 F.2d 794, 796 (8th Cir.1991); *Liebe v. Norton,* 157 F.3d 574, 577–78 (8th Cir.1998). The question is whether the measures that were taken "were so inadequate as to be deliberately indifferent to the risk." *Id.*

In this case, there are no facts to support the conclusion that Warden Timothy Schuetzle was deliberately indifferent to any harm or threat of harm towards Roberson from other inmates. The evidence does not support a finding Schuetzle had knowledge that the inmate who fought with Roberson posed a substantial risk to him under the circumstances. More, important, the evidence clearly does not show that Schuetzle had the requisite culpable state of mind. Finally, even if there was a risk of harm to Roberson, Schuetzle's actions in light of that risk were reasonable.

The relevant Incident Report of the inmate ("G.L.") who was involved in a fight with Roberson that caused Roberson's injury indicates that Roberson was in his own "cage" area, as were all AS inmates, during the time that they were taking recreation. *See* Affidavit of Timothy Schuetzle, Ex. 1, Attach. 1–9. The report indicates that Roberson had threatened G.L. G.L. claimed that Roberson was trying to break the door down to his cage and was threatening to harm him and that G.L. only pushed the door to Roberson's cage because he was trying to keep Roberson from pushing open the cage door and attacking him. There was no evidence to the contrary concerning this claim. There is no evidence presented that G.L. had ever threatened to harm or had ever harmed Roberson before this incident.

Roberson has not presented any evidence and cannot prove that Warden Schuetzle had any knowledge that G.L. was a substantial danger or risk to Roberson. Even if Roberson could prove that Schuetzle had knowledge that G.L. was a danger to Roberson, he cannot prove that Schuetzle did not take reasonable measures to keep him safe from G.L. Roberson was housed in AS and had no contact with other inmates, including G.L. When Roberson went for recreation, he was also placed in a cage by himself with a locked door. G.L. was placed in a similar locked cage. Merely because some harm may have occurred to Roberson does not demonstrate that Schutezle was indifferent to his safety. "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety', a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Farmer,* 511 U.S. 825, 844, 114 S.Ct. 1970. This alleged claim is devoid of merit.

**E. *ROBERSON'S PLACEMENT IN ADMINISTRATIVE SEGREGATION DID NOT VIOLATE HIS CONSTITUTIONAL RIGHTS.***

█ It is undisputed that Roberson was placed in AS upon his arrival at NDSP in

February 2001. This was due to the fact that Roberson had exhibited aggressive and threatening behaviors while he had been an inmate at the Cass County Jail awaiting trial. Roberson remained in AS because of a number of factors, including (1) Roberson was unwilling to go through the orientation process; (2) Roberson refused to meet with the AS Committee to discuss alternative placements; (3) Roberson displayed paranoid characteristics and refused to sign any documents; (4) Roberson displayed uncooperative and sometimes violent behavior; (5) Roberson refused to cooperate with a psychological evaluation; (6) Roberson had numerous disciplinary reports, including disorderly conduct (numerous), threats towards others (both inmates and staff), possession of contraband (homemade shank twice), possession of other inmates' property, destruction of state property, disobeying staff orders, foul language. *See* Affidavit of Timothy Schuetzle, Ex. 1, Attach. 1-1.

There is nothing inherently unconstitutional about housing an inmate in administrative segregation when it is not for punitive reasons. *Jones v. Mabry*, 723 F.2d 590, 594 (8th Cir.1983) (administrative segregation that is non-punitive "looks to the present and the future rather than to the past"); *Brown–El v. Delo*, 969 F.2d 644, 647–48 (8th Cir.1992). In *Mabry*, the Eighth Circuit held as follows:

> It is safe to say that in all prisons, except perhaps some extremely minimum security institutions, it is found to be absolutely necessary for a number of non-punitive reasons to segregate individual inmates from the general prison population, and to hold them in segregated status for varying or indefinite periods of time. [citation omitted] As long as there is a procedure for reviewing periodically the situations of inmates who are in administrative segregation ... due process is satisfied, and no pre-deprivation hearing is required by the federal constitution.

> 723 F.2d 590, 594 (*citing Kelly v. Brewer*, 525 F.2d 394, 399 (8th Cir.1975)).

It is only when the special confinement occurs because of an intent to punish the inmate for past misconduct that the Due Process Clause is implicated and requires a pre-deprivation hearing. That is clearly not the case here. Roberson was confined in AS because of a concern that the aggressive and threatening behavior he displayed in the county jail would continue if he was placed in the general population. An attempt was made to transfer Roberson so that he could go through the orientation phase of his incarceration. However, Roberson refused to agree to participate in orientation or to participate in any classes or programs. Roberson also refused to visit with a psychiatrist.

While housed in AS, Roberson refused to meet with the AS Committee to discuss his transfer to other housing. *See* Affidavit of Timothy Schuetzle, Ex. 1, Attach. 1-1 (AS Committee Reviews). Roberson indicated he wanted to remain in AS. *Id.* (AS Committee Review 5/11/01; Warden's AS Review 10/9/02). In addition, Roberson had a number of Incident Reports while in AS and Warden Schuetzle found that Roberson had not shown that he was able to follow the rules so that he could be transferred to other housing. Despite Roberson's continued threatening behavior, Warden Schuetzle attempted to have Roberson released to general population. (AS Committee Reviews 7/5/02, 8/8/02).

It is clear and undisputed from the record that Roberson remained in AS during his incarceration at NDSP because of his consistent refusals to take any action to permit a plan to be prepared for his integration into general population. There is no evidence of any punitive element to Roberson's placement in AS and his status

in AS was reviewed every 30 days. There is no merit to Roberson's claim that his placement in Administrative Segregation violated his constitutional rights.

### F. THERE WAS NO VIOLATION OF ROBERSON'S CONSTITUTIONAL RIGHTS WHEN ROBERSON'S FINGERS WERE CAUGHT IN THE TRAY DOOR TO HIS CELL.

The Court allowed Roberson to pursue the claim that Warden Schuetzle allegedly allowed guards to slam Roberson's fingers in his cell door. Roberson has never identified when or how this occurred.

According to the unrefuted Incident Report, one of the guards had approached Roberson's cell to attempt to move Roberson to the infirmary because of his behavior. Roberson began ranting and raving, threatening to kill the guard and his family, and throwing items around his cell. Roberson refused to obey the guard's orders to put his hands out of the tray door so that they could be cuffed. On two occasions, Roberson tried to punch the guard in the groin area by reaching his hands and arms through the tray door. On the second occasion Roberson attempted to punch the guard and the guard kicked at the tray door in an attempt to shut it. Roberson then stuck a container with liquid in it and "threw it/sprayed it" on the guards. After the incident, Roberson was taken to the infirmary by was uncooperative in being evaluated. He was assessed by a nurse who observed no injuries. See Ex. 2, Attach. 2–2. Under these facts, construed in a light most favorable to Roberson, he cannot prove that any violation of his constitutional rights occurred.

The Supreme Court has considered the parameters of what constitutes "cruel and unusual" punishment in the context of excessive physical force. See Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). It is only the unnecessary and wanton infliction of pain which implicates the Eighth Amendment.

> Where a prison security measure is undertaken to resolve a disturbance, ... the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

Whitley, 475 U.S. 312, 320–21, 106 S.Ct. 1078 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir.1973)).

The Supreme Court has said that it may be proper to evaluate the need for application of force, the relationship between the need and the amount of force used, and the extent of injury suffered. However, equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as perceived by prison officials on the basis of the facts known to them. 475 U.S. 312, 319, 106 S.Ct. 1078. Further, "the infliction of pain in the course of a prison security measure does, therefore, not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Id.

Under these standards and given the facts of the incident with the tray door, Roberson cannot prove that he was subjected to cruel and unusual punishment. When Roberson focused his attack on the guard's groin area, the guard obviously perceived it as a serious threat and felt the need to respond. The guard was merely trying to protect himself and was not at-

tempting to subject Roberson to unnecessary and wanton pain and suffering. Rather, the guard applied the force he did to shut the tray door in a good faith effort to prevent Roberson from hurting him. There is no evidence under these facts that it was done "maliciously and sadistically for the very purpose of causing harm."

In evaluating the seriousness of the force used, evidence of a lack of an injury also defeats Roberson's claim that excessive force rising to the level of cruel and unusual punishment was inflicted upon him. This claim is devoid of merit.

## III. CONCLUSION

For the reasons set forth above, the Court **GRANTS** the State Defendants' Motion for Summary Judgement (Docket No. 44).